**UNITED AIRCRAFT CORPORATION**

**v.**

**Henry I. BOREEN, Richard H. Moyer, John H. Kindregan, Achille Pollino, Alvin Atteson, Stephen Markoe, Louis N. Pomante and Eugene C. Conser.**

**Civ. A. Nos. 43563, 43586, 43588, 43587, 43598, 43590, 43589, 43591.**

United States District Court
E. D. Pennsylvania.
April 23, 1968.

LaBrum & Doak, Edward C. German, Joseph G. Manta, Philadelphia, Pa., Cole & Groner, Alan Y. Cole, Isaac N. Groner, Washington, D. C., for plaintiff.

Wolf, Block, Schorr & Solis-Cohen, Bernard M. Borish, Judah I. Labovitz, Philadelphia, Pa., for defendants.

JOSEPH S. LORD, III, District Judge.

## INTRODUCTION

United Aircraft Corporation ("UAC") seeks an injunction and damages based on the breach of a covenant not to compete, inducement of breach of contract

and enticement of employes, breach of fiduciary duties, and conspiracy. In its legal claims, UAC reserved trial of the issue of damages. Causes of action based on misuse of trade secrets were not heard by agreement of the parties. Equitable relief is also sought against the Solid State Scientific Corporation, not a party to this suit, based on the defendants' participation therein.

The defendants are Henry I. Boreen, Richard H. Moyer, John H. Kindregan, Achille Pollino, Alvin Atteson, Stephen Markoe, Louis N. Pomante, and Eugene Conser, all former employees of the plaintiff.[1]

The cases were consolidated for trial by agreement of the parties.

Jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332.

## FINDINGS OF FACT

1. Plaintiff is a Delaware corporation with its main office and principal place of business in Connecticut. Each of the defendants resides in and is a citizen of Pennsylvania. The amount in controversy in each cause of action in each case exceeds $10,000 exclusive of interest and costs.

2. Definitions:

(a) *Telemetry*: the engineering science of transmitting information from an inaccessible location to an accessible location. The components of a telemetry system are a transducer, the sensing device which picks up information at the inaccessible location; the transmitter, which sends the information from the inaccessible place to the accessible place; and the receiver, which receives the information at the accessible place. In order to transmit these impulses or information, it is necessary to have an electrical circuit which consists basically of three parts: a tube or transistor, which provides the flow of electrons; a resistor, which impedes the flow of electrons; and a capacitor, which stores electrons.

(b) *Transistor:* a semiconductor device which performs the function of amplification or switching.

(c) *Resistor:* an electronic device which impedes the flow of electrons.

(d) *Capacitor:* an electronic device which filters or stores electrons.

(e) *Diode:* a semiconductor device that permits the flow of electrical current more readily in one direction than in the opposite direction (rectifying).

(f) *Semiconductor:* one of a class of materials that falls in between a conductor and an insulator in regard to conductivity: *e. g.,* silicon or germanium.

(g) *Solid-State:* the name given to semiconductor devices by virtue of the fact that the semiconductor material in which the electronic action occurs is generally in a crystalline or solid form.

(h) *Integrated Circuit:* a combination of inter-connected electronic devices that performs a useful circuit function.

(i) *Thick-film Technique:* a method of building integrated circuits whereby the passive components are made by applying a film of material in the form of inks of the thickness of approximately 1/1000" onto a ceramic base.

(j) *Thin-film Technique:* a method of building integrated circuits whereby the passive elements are made by sputtering or evaporating onto a silicon substrate a film of approximately 1/1,000,000."

(k) *Hybrid or Multichip Circuit:* a circuit using the thick- or thin-film technology and hence composed of different kinds of materials on one substrate as opposed to a monolithic integrated circuit which is made of a single piece of silicon.

(l) *Tempistor:* a temperature-sensitive resistor used as a temperature gauge.

(m) *Silicon Planar Technique:* a method of making integrated circuits and components using photolithography

---

1. The present counts in suits against Robert Smith, C.A. No. 43585; Robert C. Cook, C.A. No. 43833; and Thomas M. Stavish, C.A. No. 43832, were dismissed.

First, the circuit must be designed. The components are assigned values and a schematic is prepared. The schematic is translated into a geometric layout. This pattern is cut out on a red plastic sheet (Rubylith) which is opaque to photographic light. The Rubyliths are reduced by about 400 times to produce glass masks. The medium used is a wafer of pure silicon on which a coating of silicon dioxide is formed in order to protect it from unwanted impurities. Five different glass masks are used to produce an integrated circuit. The first three masks are used with a photolithographic technique to etch out patterns on the oxide coating. After each etching the wafer is then placed in a diffusion furnace at about 1,000° C. and various gases are used to introduce impurities for diffusion into the wafer. The last two masks locate the interconnection or wiring of the various components into a circuit. Testing or probing follows. After as many as 500 circuits are completed on the wafer they are separated into individual dice and packaged. A die is fastened mechanically and electrically to the bottom of the package. This is called die-bonding. The mineralization on the circuit is connected to the package leads by the use of small gold wires. This is called wire-bonding. Finally, the integrated circuit is hermetically sealed. Components may be formed using the same technology. A transistor, for example, may be formed in the following manner: a P-type impurity (positively charged: a

deficiency of electrons) is etched onto the N-type pure silicon (negatively charged: an excess of electrons). Thereafter, an additional silicon dioxide protective coating may be formed over the wafer. Over the P-type impurity the oxide coating may be cut out to allow the P-type impurity to be etched with an N-type impurity. In this way an NPN transistor may be formed.

(n) *MOS:* metal oxide semiconductor, another way of using the planar process to build devices and circuits.

(o) *Darlington:* a Darlington is an electronic device used for amplification. Essentially, it employs two interconnected transistors. While we find it unnecessary for our decision, we conclude that plaintiff has not sustained its burden of proof on its assertion that the Darlington is an integrated circuit.[2]

3. Vector Manufacturing Company, Inc. ("VMC") was incorporated in Pennsylvania on January 24, 1956. Originally a mechanical engineering firm, VMC gradually entered the business of manufacturing and selling telemetry products until, by June of 1960, it was engaged primarily in the telemetry business. In January, 1958, VMC employed Boreen, an electrical engineer specializing in telemetry. As a manufacturer of telemetry products and systems, especially aerospace telemetry, VMC continually sought to reduce the size of the electronic circuits which it used as components. This work began with the use of miniaturized vacuum tubes, the design of a solid-state

2. The trial was taken up with an overabundance of testimony, discussion, and argument on the issue of whether the Darlington is a device or an integrated circuit. VMC was producing Darlingtons at the time of the acquisition and therefore it behooved the plaintiff UAC to show that it was an integrated circuit so that integrated circuits would be within the protection of the covenant.

In any case, on the first day of trial UAC's expert testified that an integrated circuit involved the interconnection of active and passive components. Since the Darlington uses only transistors, active components, it was argued by defendants that it did not fall within the expert's

definition. The expert later testified to the effect that an integrated circuit did not require the use of passive components.

It was then argued by defendants that the Darlington was not an integrated circuit because it could not perform a useful circuit function without the use of an external resistor, since without a resistor the current goes into ground. The Darlington will not register on an oscilloscope without a resistor. Still, UAC could show that the Darlington did in fact amplify a signal by the use of an ammeter. Defendants countered that the needle of the ammeter constituted an external resistor.

diode beginning in 1960, and continued with the design and fabrication of highly sophisticated solid-state electronic devices. In 1961, VMC established a microminiaturization laboratory which became known as the Microlab or Solid-State Laboratory.

4. In 1963 VMC was faced with a shortage of capital for expansion purposes and therefore sought acquisition by a larger corporation. To this end it began negotiations with United Aircraft Corporation. On December 30, 1963, VMC and UAC entered into a Plan and Agreement of Reorganization ("Plan"), which provided, *inter alia*, for the transfer to UAC "of substantially all the assets, properties, business and goodwill" of VMC "as a going concern."

5. Pursuant to ¶8.14 of the Plan, Henry Boreen, then Vice President and Director of Research and Development, as well as the two other principals of VMC, Stanley Wulc, President and General Manager, and Dr. Emanuel Wolff, Treasurer, executed the following agreement not to compete, on February 14, 1964:

"VECTOR MANUFACTURING
COMPANY, INC.

Southhampton, Pennsylvania

February 14, 1964

"United Aircraft Corporation
400 Main Street
East Hartford, Connecticut, 06108

"Dear Sirs:

"In order to induce you to purchase the assets of Vector Manufacturing Company, Inc. ("Vector") pursuant to the provisions of the Plan and Agreement of Reorganization dated December 30, 1963, between you and Vector and in consideration of your agreement to employ the undersigned, the undersigned, being an officer, director and one of the principal stockholders of Vector, hereby agrees that, for a period of five years from the date hereof or from the date the employment of the undersigned by you shall cease, whichever is later, the undersigned will not, without your prior written consent, directly or indirectly, on a full or part-time basis, engage in or perform any services as a principal, partner, substantial stockholder, trustee, officer, director, employee, consultant or otherwise in connection with the manufacture or sale of any product competitive with the products being manufactured or under development by Vector on the date hereof or which at the time of the termination of the undersigned's employment with you are being manufactured or developed by that portion of your business being carried on with substantially the assets acquired by you pursuant to the said Plan and Agreement of Reorganization.

Very truly yours,
VECTOR MANUFACTURING CO.,
INC.
/s/ Henry I. Boreen
Henry I. Boreen"

6. Immediately following the acquisition of VMC by UAC Boreen was employed as Chief Engineer of what was then called the Vector Department of the Norden Division of UAC and Assistant Secretary of UAC at a salary of $28,000 a year.

7. On May 1, 1965, when the Vector Department became the Vector Division of UAC, Boreen was promoted to Vice-President of the Vector Division, in which capacity he served until he left Vector on March 1, 1957.

8. During his employment with UAC, Boreen was employed at will.

9. The Vector Department, and later the Vector Division, carried on and expanded the business of VMC. The assets acquired from VMC remained in the Vector Division on March 1, 1967, the date that Boreen terminated his employment with UAC.

10. The VMC assets which UAC purchased pursuant to the Plan included equipment worth approximately $1,500,-000 of which $1,400,000 was being used on March 1, 1967, in the main plant in the production of conventional telemetry

equipment and $100,000 worth was being used in the Microlab to build solid-state devices for use in telemetry applications and for sale on the market as discrete devices. As of March 1, 1967, this $100,000 worth of VMC equipment constituted 10% of the value of the total equipment used in the Microlab.

11. On February 14, 1964, VMC was manufacturing and had under development a variety of solid-state devices, including Darlingtons, several kinds of transistors, resistors, capacitors, diodes, tempistors, and hybrid thick-film integrated circuits.

12. To this date VMC had never marketed any solid-state devices save in conjunction with its telemetry business.

13. Several months before the acquisition, however, VMC had begun to negotiate with Jack Kindregan in an attempt to hire him as Sales Manager for solid-state devices, in regard to sales not connected with VMC's telemetry business. Kindregan agreed before the acquisition to accept the position with VMC, but did not actually come aboard until February 26, 1964.

14. In September, 1965, Vector Division employed defendant Achille Pollino as Production Manager for Solid-State Components.

15. On September 27 of that year, defendant Eugene Conser was hired for work in linear integrated circuits.

16. On March 14, 1966, Jack Dale was hired to work on hybrid circuits.

17. Tom Sikina was hired on August 15, 1966, as head of research and development.

18. On October 24, 1966, defendant Stephen Markoe came to Vector to work in thin-film circuitry.

19. Kindregan had established a sales department for solid-state devices by June of 1964 and by that time had produced the first sales brochure. The first sale to an outside customer was made on June 4, 1964: diode wafers without metalization to IT&T Semi-Conductor, Inc.

20. On March 1, 1967, the products manufactured by the Vector Division included integrated circuits of the following varieties: monolithic, multiple-chip, thin-film, thick-film or hybrid, and metal oxide silicon field effect ("MOSFET"); various kinds of transistors; and discrete devices such as tempistors, silicon dioxide capacitors, resistors and capacitors, and several kinds of diodes. Vector's products included custom as well as standard devices.

21. The genesis of the facts which gave rise to the present law suit began on March 1, 1967 when Boreen left the employ of the Vector Division of UAC. Several days afterward, Boreen contacted Richard Moyer, the Manager of the Microlab, and introduced to him the idea of forming a company to manufacture and sell solid-state devices. Moyer at that time was dissatisfied with his position at Vector for several reasons and he expressed an interest in Boreen's idea, contingent on Boreen's raising sufficient capital. The two men discussed the cost of purchasing the necessary equipment.

22. During the third week of March, 1967, at the time of the Institute of Electrical and Electronic Engineers ("IEEE") Show in New York, Moyer began discussing the possibility of entering into a business venture involving Boreen, with other employes of the Microlab. These included the defendants Pomante, Atteson, Pollino, Conser, and Markoe, as well as Jack Dale.

23. Moyer attended the show as a representative of UAC's Vector Division and spoke with several of the defendants on his way there as well as at the show itself on March 21. Boreen and Moyer also looked at the equipment displayed at the IEEE Show.

24. Among those Moyer contacted at the Show was Harry Hellman, engineer for Goodyear Aerospace Company, to whom he offered an opportunity to join in forming a new company.

25. Several of the defendants were dissatisfied with the situation at Vector which resulted from decisions taken by

its management. These included Moyer, Kindregan, Pollino, and Markoe.

26. On the evening of April 3, 1967, a meeting was held at Boreen's home which was attended by Boreen, Moyer, Pomante, Atteson, Conser, Markoe, and Pollino, at which time Boreen unfolded his ideas about the formation of the new company.

27. Boreen showed those attending the restrictive covenant he had given to UAC pursuant to the sale of the VMC business.

28. Following this meeting, Boreen began to seek capital for the new venture, and late in April he received the necessary financial commitment. At about this time defendant Kindregan returned from Europe and was informed of Boreen's plans.

29. On the evening of May 2 another meeting took place at Boreen's home, attended by most of the defendants and Boreen's lawyer, Arthur Keyser, Esquire. Keyser explained some of the legal aspects of the imminent incorporation and the concomitant securities features. In addition, he explained his interpretation of Boreen's restrictive agreement, to wit, that Boreen could not engage in the manufacture and sale of telemetry devices, but was free to compete with UAC in regard to solid-state devices.

30. A Certificate of Incorporation was granted to the new company, Solid-State Scientific Corporation ("SSSC"), on May 9. A Stock Subscription Agreement and Employment Agreements, dated May 9, 1967, were signed sometime between May 11 and May 18.

31. On May 15, Boreen became President of SSSC.

32. Pursuant to the Stock Subscription Agreement there were to be two offerings. $400,000 had to be raised in a first offering before the principals of SSSC—Boreen, Moyer, Atteson, Conser, Kindregan, Markoe, Pollino, Pomante, and Hellman—would be required to purchase stock in a second offering. Boreen raised the $400,000—40,000 shares at $10 a share—as follows: Boreen himself, $90,000; R. W. Pressprich Co., $160,000 on its own behalf, and $10,000 as agent for some of its employes; various other persons associated with Boreen, $130,-000; and the law partnership of Kleinbard, Bell & Brecker, counsel for Boreen and SSSC, $10,000. The second offering consisted of 95,000 shares at one dollar a share. Boreen took 40,000 of these shares; Moyer 20,000; and Atteson, Kindregan, Markoe, Conser, Pollino, Pomante, and Hellman, 5,000 each.

33. In addition to the financial participation of Boreen mentioned above, he co-signed two notes: one of $5,000 for Conser and one of $15,000 for Moyer.

34. All of the defendants participated in the purchase of SSSC shares and all of them eventually took employment with the company.

35. Other employes of the Vector Division who left to come with SSSC were Robert Smith, Robert C. Cook, Thomas M. Stavish, and Mrs. Rosemarie Romano. In addition, Jack Dale and John Hall were asked to leave Vector and come with SSSC but did not do so.

36. On May 19, 1967, Moyer handed in his resignation to UAC; his last day of work was May 26, 1967.

37. On May 20 and 21 Moyer and Boreen prepared a proposal in response to a Request for Quotation ("RFQ") from the National Aeronautics and Space Administration ("NASA"). This RFQ had been secured by Hellman on behalf of SSSC and he had given it to Boreen.

38. While preparing the SSSC proposal Moyer had in his possession, used, and copied from a proposal previously submitted by Vector to NASA on a different RFQ, for a silicon semiconductor monolithic oscillator.

39. The information contained in the earlier Vector proposal was not proprietary in nature.

40. Moyer was able to and did prepare the diagram of the dielectric process submitted to NASA by SSSC in its proposal substantially from his own knowledge.

41. While Moyer was preparing the SSSC proposal on May 19 he called Conser to ask him general questions related to integrated circuitry.

42. Vector Division, which had originally received a copy of the NASA RFQ, had decided to "no quote" it about one week earlier, partially on the advice of Conser.

43. At the time that Conser advised his superior, Sikina, that the design prepared by another Vector employe for the NASA RFQ could not be integrated, he did not know that Moyer and Boreen were planning to quote the same RFQ. Nor did he know that Moyer was working on the same RFQ when he was called on May 19.

44. The SSSC proposal, unlike that the design of which Conser said could not be integrated, took exceptions, i. e., it varied from the original specifications. Conser was not consulted by Moyer or Boreen in connection with the taking of these exceptions in the SSSC proposal.

45. SSSC's proposal was successful and it received a dual award from NASA along with another company.

46. On June 21 Kindregan, Pomante, Atteson, Markoe, and Conser submitted their resignations to Vector officials.

47. The defendants, all employed in the Solid-State Laboratory, constituted a very significant portion of its managing body. Following is a list of the management of the Solid-State Laboratory, with the names of those who left Vector to join SSSC in italics: *Moyer*, Manager; Sikina, Intermediary Supervisor with respect to Research & Development; *Conser*, Mask Making and Linear Integrated Circuits; *Pomante*, Processing and Diffusion; *Atteson*, Discrete Components; *Markoe*, Thin-Film; *Pollino*, Production; *Smith*, Evaluation and Test; Dale, Hybrid Circuits; Kons, Digital Integrated Circuits; Robinson, Packaging-Tempistors; and *Kindregan*, Sales. The defendants now serve in similar capacities for SSSC.

48. Kindregan retained a list of names, with telephone numbers of companies in the solid-state industry, which he had collected during his employment with Philco Corporation, Lansdale Division, from 1960 to 1963, with Texas Instruments from 1963 to 1964, and with Vector from 1964 to 1967. Kindregan used these names in his capacity as head of solid-state sales at Vector.

49. There is great mobility among engineers in the electronics industry. The movement takes place singly and in groups. It occurs because of the great demand by competing companies for people with talent in addition to the desire of the engineers for personal advancement.

50. The defendants were all employed by UAC at will.

51. Except for Boreen, defendants' reasons for leaving Vector were either that they were dissatisfied with their situations at Vector, or to advance themselves economically by forming SSSC, or both.

52. Boreen left Vector because he was dissatisfied with his arrangement with and progress in UAC and Vector.

53. Defendants, in leaving Vector, had no purpose or intent to injure Vector.

54. Defendants' inducement or persuasion of each other and of other employes to leave Vector was not to injure Vector, but to secure competent personnel for SSSC.

55. Defendants in good faith and on the advice of counsel believed that the formation and activities of SSSC would not be a violation by Boreen of his covenant with UAC.

56. Defendant Markoe retained a copy of Vector's diode sputtering system which he never used and no longer has in his possession.

57. In planning the formation of SSSC, the defendants, except for Boreen, made some use of Vector working time. The amount of the time so used was minimal.

58. The defendants carried on their plans for the formation of SSSC largely in secrecy.

59. SSSC is presently engaging in the manufacture and sale of solid-state devices competitive with those which UAC's Vector Division was manufacturing and developing on March 1, 1967, the date on which Boreen terminated his employment with UAC, and with products manufactured or under development by VMC on February 14, 1964, the date of UAC's acquisition of VMC.

## DISCUSSION

## I. THE COVENANT

### A.

Solid State Scientific Corporation is manufacturing and selling products which are competitive with devices now being marketed by UAC, devices which VMC was manufacturing or developing at the time of its acquisition by UAC. The question is whether these devices are

" * * * products being manufactured or under development by Vector on [February 14, 1964] * * *"

within the terms of the covenant.

The products which UAC seeks to insulate from competition through the covenant had never been offered for sale in their own right until after the date of acquisition. On February 14, 1964, these devices were being used by VMC as components of the telemetry devices which comprised its major business. From these facts the defendant Boreen argues that the products of UAC with which he is now competing were not "products" of VMC on the date of sale and that they are therefore not protected by this part of the covenant. What the parties meant by "products", according to Boreen, were those things that VMC was marketing on the crucial date, to wit, telemetry devices, telemedics products, and industrial products. It is true that with some modification those components were readily marketable products for outside sale. However, Boreen argues that until they were actually offered to the industry, which had never been done by VMC before the acquisition, they were not among VMC's products.

The basic position of UAC is that solid-state devices manufactured by VMC for in-house use in telemetry systems are "products" within the meaning of the covenant even though they were never offered for outside sale. Ultimate application, argues UAC, whether for in-house use or outside sale, is irrelevant under the terms of the covenant. Secondly, there were in fact outside sales before February 14, 1964.[3] Finally, UAC contends that these devices were considered products at the time of the acquisition by virtue of the fact that VMC was then preparing to enter the solid-state market. This is witnessed by its negotiations with Kindregan to take charge of marketing these devices and the fact that so shortly after the acquisition Vector[4] did in fact enter the solid-state market.

To begin with, we reject the view that "products" protected under the covenant encompasses components of telemetry systems never marketed or considered for marketing separately. Such a definition disregards the word "competitive." We do not think that the parties intended to prevent Boreen from engaging in the sale of transistors for general use if neither VMC nor UAC had ever used transistors apart from application as telemetry components.[5] The capacity for being separately marketable, moreover, does not suffice: competition in the air is not enough.

On the other hand, the fact that these solid-state devices were being manufactured and developed primarily for in-house use as telemetry components does not negate the fact that VMC was aware

3. These sales were closely related to VMC's telemetry business and do not show that VMC was then offering solid-state devices on the open market.

4. "Vector" refers to the Vector Department of UAC's Norden Division, as well as its successor, the Vector Division of UAC.

5. It is doubtful that a court of equity would enforce a covenant written so broadly, as a matter of public policy.

of their potential for sale in their own right and that on February 14, 1964, VMC intended to market them in the near future. We do not think it is necessary for UAC to show that these devices were being marketed on the date of acquisition nor that concrete steps had then been taken to offer these devices for sale. Shortly thereafter Vector was in fact marketing solid-state devices which it had been manufacturing and developing on the crucial date.

It is significant that the language of the covenant looks beyond February 14, 1964. Devices marketed after the sale, competitive with products now manufactured by Boreen, but considered for marketing before the sale are clearly products within the meaning of the covenant.

Our conclusion that marketing before the sale is not essential for the inclusion within the covenant of a product marketed after the sale is supported by the use of the language "under development." A device under development at the time of the sale and later marketed so that it was competitive within the meaning of the covenant would be protected without having been marketed before the sale.[6]

In view of the evidence that VMC harbored a pre-acquisition intention to market independently devices which it had successfully developed in another application, we are convinced that the protection of these devices was within the contemplation of the parties to the covenant. UAC had a legitimate interest in protecting products which at the time of the sale were being developed by the VMC assets with only a future intention to begin marketing them. Indeed, the solid-state capability of the Microlab has proven to be a valuable asset acquired from VMC. Had the parties intended to limit the scope of the covenant to telemetry, telemedics, and industrial products they were fully capable of doing so. They did not.[7]

### B.

Boreen has agreed not to manufacture or sell

"* * * any product competitive with the products * * * which at the time of the termination of [Boreen's] employment with [UAC] are being manufactured or developed by that portion of [UAC's] business being carried on with substantially the assets acquired by [UAC] pursuant to the said Plan and Agreement of Reorganization."

The question here is whether the products which UAC seeks to protect under the terms of the covenant are being manufactured and developed by a portion of its business which fits within the meaning of the covenant. It is not disputed that SSSC, a business in which the defendant Boreen plays a crucial part, is engaged in selling solid-state products that are in competition with those that were being manufactured and developed by the Vector Division of UAC on the date on which Boreen terminated his employment.

---

6. Consider for example a hypothetical telemetry device being developed by VMC at the time of the sale. Boreen concedes that such a device is protected under the covenant, because he argues that what was meant by "products" were those things which VMC was primarily engaged in selling, i. e., telemetry, telemedics, and industrial products. Yet the covenant does not support Boreen in that in using the word "products" it does not limit its scope to those items which were the primary business of VMC. If a telemetry device under development is protected, why not also a purely solid-state device?

7. At the hearing Boreen attempted to introduce extrinsic evidence to show that the covenant agreed to was narrower than that originally proposed by UAC. See UAC's Proposed Draft dated 1/13/63, in which Boreen substituted the word "competitive" for the proposed word "similar." We need not decide the evidentiary question because in considering this part of the Proposed Draft we find it of no aid because there is no doubt as to the meaning of the word "competitive." As to its relative breadth in contradistinction to the word "similar", see United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964).

UAC's position is that the purpose of the language "that portion of your business being carried on with substantially the assets acquired [from VMC]" was to identify the Vector Division, that portion of UAC which was to carry on the business of VMC, as distinguished from the other divisions or departments of United Aircraft.[8] It notes that a substantial part, if not all, of the assets acquired from VMC remain in the Vector Division and are being used to carry on that portion of UAC's business.

Boreen argues that it is the Microlab of the Vector Division that is manufacturing and developing the products which UAC seeks to protect: that since only 10% of the equipment used in the Microlab came from VMC, the Microlab is being carried on with substantially assets other than those acquired from VMC; and that consequently the Microlab is not "that portion of [UAC's] business being carried on with substantially the assets acquired [from VMC]."

■ We note at the outset that the terms of the covenant do not require that the products protected were, on the date of the termination of employment, being manufactured or developed with what were formerly VMC assets, but only that they were being manufactured or developed by a portion of UAC's business that by virtue of its relationship to the VMC assets is identified in the covenant.[9]

The meaning of the language "that portion of your business being carried on with substantially the assets acquired by you [from VMC]" is perplexing. Nei-

ther party can rest on a plain meaning approach. The argument of Boreen attempts to tie in the word "substantially" with the phrase "being carried on with": unless the Microlab is being carried on substantially with the VMC assets—in effect, unless it is those assets that are to a large extent responsible for the running of the portion of UAC's business called the Microlab—the products of the Microlab are not protected. On the other hand, UAC would associate the word "substantially" with the phrase "the assets acquired by you [from VMC]," in an effort to show that the portion of its business that encompasses these assets or a substantial portion thereof, which carries on the VMC business with whatever additional assets it may acquire, is that portion of its business the products of which are protected under the terms of the covenant.

Analyzed grammatically, the position of the word "substantially" makes little sense. Although it is an adverb it appears to modify no verb or adjective. In this form it cannot grammatically modify the noun "assets."

■ UAC argues that, from the surrounding circumstances and the very purpose of the acquisition itself, the need for additional capital for the expansion of VMC's business, it is inconceivable that the covenant should be written in such a manner so that it last only so long as the increment in the assets remains insubstantial. And yet, though this point is well taken, we are not free to disregard the troublesome language

---

8. At the time of the acquisition UAC had six divisions: Pratt & Whitney Aircraft (aircraft engineers); Hamilton Standard (aircraft propellers); Sikorsky Aircraft (helicopters); United Technology Center (research in missiles and space vehicles); United Aircraft Corporate Systems Center (business management); and Norden (advanced navigation, guidance, and control systems and electronic devices for space vehicles, missiles, aircraft, ships and submarines).

9. There is no direct evidence as to what percentage of Vector Division assets were acquired from VMC, although we find

that 10% of the physical equipment of the Microlab was among the assets acquired from VMC. In arguing that the language in question identifies the Vector Division, UAC does not attempt to prove that a substantial portion of the total Vector Division assets came from VMC. What is relevant, according to UAC, is that the VMC business and the assets of VMC remain part of Vector Division. Nor does UAC attempt to total up *all* the assets of the Vector Division, including intangible assets, to show that these comprise a substantial portion of the Vector Division total.

of the covenant.[10] Because of the difficulty with this language, we look to extrinsic evidence to determine what the parties meant. See, e. g., White Heat Products Co. v. Thomas, 266 Pa. 551, 109 A. 685 (1920).

In that portion of the evidence dealing with the first part of the covenant, see supra, Boreen introduced a draft of the covenant proposed by counsel for UAC and sent to his counsel, dated January 13, 1964. It was in this proposal that there first appeared the mysterious word "substantially." [11] UAC's proposal read in part as follows:

"[that Boreen would not engage in or perform any services] in connection with the manufacture or sale of any product similar to the products * * * which at the time of the termination of the undersigned's employment with you are being manufactured or developed by that portion of your business being carried on substantially with the assets acquired by you pursuant to the said Plan and Agreement of Reorganization." [12]

The position of the word "substantially" in this original draft would seem to support Boreen's position that what identifies the business, the products of which are protected, is whether it is being carried on to a large degree with the VMC assets. The position of the word "substantially" is crucial here.

Apparently, however, Boreen was not satisfied with this language. We find that the word "substantially" is crossed out and inserted in pencil as follows in the sentence:

" * * * with substantially the assets * * *."

This is how the covenant reads in final form. Since the changes appear in the handwriting of his counsel, it is probable that Boreen was responsible for this change in the position of the word "substantially", a position more favorable to UAC than that which appeared in the draft proposed by UAC. This irony shows the contrast between the language proposed by UAC, which would tend to support the position Boreen now takes, and the language which did in fact become part of the covenant, which does not.

As stated above the very purpose of the principals of VMC in selling the business, the need for additional capital for expansion purposes, militates against Boreen's interpretation of the covenant which limits UAC's protection to a period before significant expansion had taken place in the Microlab. We find it difficult, moreover, to see how the Microlab must necessarily be the relevant portion

10. We may not discard the word "substantially."
 "[A] word not plainly inserted by accident or mistake is never to be thrown out entirely while there is a plain and natural construction which can be given to it, not manifestly destructive of the general intent of the sentence." City of Philadelphia v. River Front R. Co., 133 Pa. 134, 19 A. 356 (1890).
 This is part of the rule of construction, *ut res magis valeat quam pereat.* Cf. Note, The South-West Africa Cases: *ut res magis pereat quam valeat,* 115 U. Pa.L.Rev. 1170 (1967).

11. Section 8.14 of the Plan and Agreement of Reorganization executed by VMC and UAC on December 30, 1963, Covenant Not To Compete And Related Opinion, did not include the word "substantially," but required from the three principals of VMC, including Boreen, an agreement not to compete in products

"which are at the time of the termination of employment with United, then being developed or manufactured by that portion of the business of United to be carried on with the assets acquired by United under this Agreement * * *."
 Cf. Plan and Agreement of Reorganization, p. 1: " * * * the transfer to United of substantially *all* the assets, properties, business and goodwill of the Seller * * *." (Emphasis supplied).

12. At the insistence of Boreen the language "similar to" was changed to "competitive with" in the final draft, and this change is reflected in the penciled annotations and corrections made by Boreen's attorney, Joseph S. Kleinbard, Esquire, whose penciled initials appear at the bottom of the page of the proposed draft, under the notation "1/21/65—Spoke to Craig—J.S.K." "Craig" was UAC's counsel.

of the business of UAC for purposes of testing the Vector Division products under the covenant.[13] For the devices produced and developed by the Microlab are also produced and developed by the Vector Division, of which the Microlab is a part. Furthermore, the failure of Boreen to deal with the word "assets" in the covenant except as it includes physical equipment is not justified. The intangible assets such as goodwill and the organization which VMC had established are the things which show that in writing the covenant as they did and using the word "assets" the parties did not mean to isolate a portion of UAC's business, such as the Microlab, the assets of which were merely physical. The Microlab was not a portion of UAC's business in the sense in which it is used in the covenant.

We find that one feature of the covenant is particularly important. The part of the covenant now being considered begins to run from Boreen's termination of employment. Although the consideration for the entire covenant was both the purchase of the assets and the employment agreement, this latter part of the covenant is in the nature of a covenant not to compete ancillary to an employment agreement. It was important for UAC, then, to prevent Boreen from competing with the products manufactured by the portion of its business in which he would be employed. Examined in this light, the language "that portion of [UAC's] business being carried on with substantially the assets acquired [from VMC]" appears more likely to have been used to identify the yet unnamed portion of UAC's business in which Boreen would be working rather than to isolate the VMC assets in an effort to limit the protection of the covenant to those products which those assets played a substantial part in producing.

UAC's Vector Division is, in fact, being carried on substantially with assets other than those acquired from VMC,

as well as with substantially the assets acquired from VMC. We believe that the language of the covenant refers to that portion of UAC's business being carried on with a substantial portion of the assets acquired from VMC, i. e., the Vector Division.

We find then that the language of the covenant describes the part of UAC in which Boreen would be employed, associated with the business that the principals of VMC conveyed to UAC, and that part of UAC is now the Vector Division.

Since SSSC is manufacturing and selling solid-state products competitive with those which VMC was manufacturing and developing on February 14, 1964, and which Vector Division of UAC was manufacturing and developing on March 1, 1967, Boreen is in breach of the covenant.

## II. INTERFERENCE WITH CONTRACT RIGHTS

The plaintiff UAC complains that Boreen first, then Moyer, then all of the defendants, attempted to and did lure from its employ valuable employes in order to have them take work with SSSC for the purpose of doing injury to UAC. This claim is based on the tort of wrongful interference with contract rights. See Lumley v. Gye, 2 El. & Bl. 216, 118 Eng.Rep. 749 (1853).

To begin with, we find that the statement in plaintiff's brief (p. 84) that the defendants "left Vector as a team * * * in order to inflict the maximum damage and injury upon Vector" is patently inaccurate. This is belied in part by the fact that the defendants took a substantial risk in entering upon a new venture in the solid-state business. Furthermore, except for an isolated and somewhat ambiguous statement by the defendant Moyer ("Mr. Harter [his superior at Vector] hasn't heard the end of me yet"), there is not

---

13. The testimony of Conser indicates that integrated circuits produced in the Microlab were designed by people in the telemetry section. It seems strained, therefore, to consider the Microlab a discrete portion of UAC's business.

a shred of evidence that the defendants were motivated by a desire to do harm to UAC's Vector Division. Even though injury to Vector may have been reasonably foreseeable, nevertheless the plan to form SSSC manifested an intention of the defendants to better their own lot rather than an intention to injure Vector.

The crucial fact here is that the defendants were all employed at will. The inducement to terminate an employment terminable at will is not actionable where the purpose is to secure the services of valuable employes rather than to injure the former employer or to have the employes commit wrongs, such as to misuse trade secrets, to entice away the custom of the former employer, or to breach a covenant not to compete.

In Albee Homes, Inc. v. Caddie Homes, Inc., 417 Pa. 177, 207 A.2d 768 (1965), the employment agreements were terminable at will. As in this case, the chancellor there found the purpose of the defendant's offer of employment to be "to secure the services of 'particularly gifted or skilled' employees," rather than to deprive the plaintiff of their services. 417 Pa. at p. 182, 207 A.2d at p. 771. Significantly, that case involved a restrictive covenant which was enforceable in part and unenforceable in part because of unreasonableness. The court held that as to that part of the covenant that was not enforceable an action would not lie for inducement of breach of contract. This is the equivalent of holding that when there is no contract not to compete, as in the present case, and the employment is at will, and where the purpose of the offer of employment was to secure the services of valuable employes and not to commit wrongs, the inducement is not actionable.[14]

Morgan's Home Improvement Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957), on which UAC relies, does not suggest a contrary result. Although the employment agreements there were terminable at will, the employes had covenanted not to compete with the plaintiff and not to solicit its customers for a period of one year following termination. It was on these contractual breaches that the wrongful inducement was found, not on the interference with the at-will employment. 390 Pa. at p. 633, 136 A.2d 838. To the same effect is Jacobson & Co. v. International Environment Corp., 427 Pa. 439, 235 A.2d 612 (1967).

Furthermore, the elements of the enticement found in *Martucci,* are lacking here.

"\* \* \* We are convinced after careful examination that the defendant Morris Spiller engaged in the systematic enticement of plaintiff's employees for the purpose of disrupting its business and obtaining its confidential customer information. \* \* \*" 390 Pa. at p. 635, 136 A.2d at p. 848.

Sperry Rand Corp. v. Rothlein, 241 F. Supp. 549 (D.Conn.1964) is no comfort to plaintiff. It involved alleged breaches of covenants not to reveal trade secrets as well as inducement of plaintiff's employes to take up employment with a competitor. Concerning the count charging inducement of a large number of skilled employes to take employment with the defendant's company, the court said, at p. 565:

"\* \* \* The purpose of considering it at all is not to decide whether the defendants [sic] conduct in this regard was in itself separately actionable but as evidence of the intention and plan by the defendants, while still on Sperry's payroll, to take and use Sperry's production process for manufacturing transistors as speedily and completely as possible, regardless of the probable extent of damage to their employer whose best interests they were pretending to serve. \* \* \*"

A final question remains. Does the fact that the defendants acted in concert and secretly make actionable that which otherwise would not be? We think not.

---

14. Although Boreen was subject to a covenant not to compete, he left Vector without influence by any of the other defendants.

If an outside employer wished to obtain the services of these employes he could have done so consistent with Pennsylvania law if his motives were similar to those of the defendants. We think that the defendants are in no worse position in joining together for their mutual benefit and launching a competing business, consistent with their duties of loyalty and the duty not to divulge trade secrets. This kind of economic liberty enjoyed by the defendants is basic to the spirit of our society and a court should not interfere where the very contract sought to be protected imports freedom of action. Cf. Spring Steels, Inc. v. Molloy, 400 Pa. 354, 162 A.2d 370 (1960).

 Since we find there was no intent by defendants to injure UAC or to induce wrongful conduct by the former employes, and since no one except Boreen was a party to a covenant not to compete, defendants are not liable for wrongful interference with the contractual relations of UAC.

### III. BREACH OF FIDUCIARY DUTIES

#### A.

*The formation of SSSC; seeking employes from the Vector Division of UAC; forming and investing in a company which would compete with the Vector Division.*

With the exception of Boreen, the defendants participated in the formation of SSSC while still employed in the Vector Division. In addition, several, if not all of them, encouraged other employes of Vector to leave while still on the Vector payroll. These activities were done in secrecy.

 The general rule is that "[u]nless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency." Rest. Agency Second § 393. After the termination of the agency, however, the agent is under no such disability. And even during the agency, the agent may make preparation to compete with the principal upon termination of the agency, although he may not at that time use confidential information or solicit the customers of his employer. Rest. Agency Second, § 393, comment e. The line then is drawn between competing with the principal during the agency and preparing to compete. Even though it is certainly not in the employer's best interests to have the employe begin preparations to compete while still in his employ, this kind of derogation from the general notion of loyalty is not an actionable breach of fiduciary duty.

This area of the law is not without difficulty. Comment e of § 393 illustrates this point.

"The limits of proper conduct with reference to securing the services of fellow employees are not well marked. An employee is subject to liability if, before or after leaving the employment, he causes fellow employees to break their contracts with the employer. On the other hand, it is normally permissible for employees of a firm, or for some of its partners, to agree among themselves, while still employed, that they will engage in competition with the firm at the end of a period specified in their employment contracts. However, a court may find that it is a breach of duty for a number of the key officers or employees to agree to leave their employment simultaneously and without giving the employer an opportunity to hire and train replacements."

The contracts referred to in the Comment are presumably not terminable at will, unlike the contracts here. Nor is this a case where the employes left "without giving the employer an opportunity to hire and train replacements." [15]

In any event, we think this case is governed squarely by Spring Steels, Inc. v. Molloy, 400 Pa. 354, 162 A.2d 370 (1960). There, the defendant Molloy had been the vice-president of the plaintiff.

---

15. On the contrary, Boreen offered to have the defendants employed by Vector on June 19 or 20 stay on with Vector as long as they were needed.

On the day he left its employ he took with him four key employes, a salesman, shop foreman, warehouseman and office manager. The action in equity was based on unfair competition, alleging misuse of a customer list and trade secrets, and adopting a corporate name deceptively similar to that of the plaintiff. The complaint was dismissed and the final decree affirmed on appeal. Speaking of the right of employes at will to leave their employer together to set up a rival business, the court said, at p. 357, 162 A.2d at p. 372:

" * * * the employees were free employees. They were not under contract with the plaintiff company. The company could discharge them at any time they chose, and, returning like for like, the defendants were equally free to part company with their employer when it should please them to do so. * * * "

And further, at p. 362, 162 A.2d at p. 374:

" * * * To enjoin Molloy from forming an independent business enterprise with his own associates would, under the circumstances of this case, be violative of the spirit of free competitive enterprise in America. In order to bind Molloy permanently to its firm, the plaintiff would have had to offer some special consideration to him for surrendering what was his inalienable right to determine for himself what should be his future career. * * * There was no quid pro quo in the case at bar. * * * "

Nor was there here.

■ There was nothing, then, to prevent Moyer and the other defendants, all employes at will, to agree among themselves and with Boreen to form a new company that would compete with UAC once they left its employ.

Furthermore, "[i]f such a right is to be in any way meaningful for an employee not under contract for a definite term, it must be exercisable without the necessity of revealing the plans to the employer." National Rejectors, Inc. v. Trieman, 409 S.W.2d 1, 21, 26–27 (Mo. 1966).

### The NASA proposal.

On April 18, 1967 the National Aeronautics and Space Administration issued a Request for Quotations (RFQ) to design, fabricate, test, and deliver 12 general purpose integrated circuit differential amplifiers. Harry Hellman secured a copy of this RFQ for Boreen and Moyer prepared a proposal for these differential amplifiers and SSSC was eventually awarded the contract. The Vector Division chose not to quote on this RFQ. UAC urges that the defendants wrongfully conspired to prevent Vector Division from quoting the NASA RFQ because they wanted the contract for themselves.

In the early part of May, Tom Sikina, head of research and development in Vector's Solid-State Laboratory gave the RFQ to defendant Conser to evaluate it and to determine whether or not Vector should quote on it. Conser was at the time in charge of the Linear and MOS Section of the Integrated Circuit Department at Vector. Conser told Sikina that he was not a circuit designer and did not understand the specifications. The designing of the integrated circuits at that time was being done by the telemetry group. Conser's job would be to take the design and lay it out on a single silicon chip. The circuit was designed by Vasile Uzenoglu, Manager of Research and Development of Airborne Telemetry at Vector and returned to Conser in about two weeks. Uzenoglu's design for the NASA RFQ was done without taking exceptions, that is, without making any modifications.

When Conser received the circuit design from Uzenoglu he examined it and concluded that it could not be integrated. On or about May 15 Conser discussed the RFQ with Sikina and they decided that Vector should "no-quote" it. They agreed that Conser should write Sikina a letter stating why he thought Vector

should not respond to the RFQ. This letter was sent and dated May 16, 1967.

SSSC's proposal to NASA, dated May 19, 1967, was, according to the testimony of Boreen and Moyer, prepared on May 20 and 21. UAC argues from the fact that the proposal was dated May 19, the date of Moyer's resignation, that he had in fact done work on the proposal while still employed by Vector. Whether this would amount to a breach of Moyer's duty as a fiduciary will be considered below. In any case, Moyer called Conser on Saturday, May 20, and asked him for information which he needed concerning SSSC's NASA proposal. Conser testified that "The only questions he asked me were processing questions which could apply to almost any integrated circuit." (R. 741). Conser also stated that neither on the date on which he wrote the letter to Sikina, May 16, nor on the date when he received the call from Moyer, May 20, did he know that Moyer and Boreen were working on the very same RFQ on behalf of SSSC; that he did not know the subject matter of the NASA proposal on which Moyer was working until a few weeks after it had been submitted. Conser maintains that he had nothing to do with the circuit design that appears on the SSSC proposal. Furthermore, SSSC took exceptions in its NASA proposal. Conser denies having had anything to do with SSSC's taking these exceptions.

In preparing the SSSC proposal Moyer made reference to an earlier proposal of the Vector Division for a silicon semiconductor monolithic oscillator, dated January 16, 1967. This device was different from that of the NASA RFQ on which Moyer was working, but he utilized certain passages, indeed copied them, for use in the SSSC proposal. There was no showing, however, that any of the information used by Moyer was proprietary in nature. The dielectric process diagrams were identical in both proposals. Moyer testified that he had known this process and made the drawing in the SSSC proposal from memory.

NASA awarded dual contracts to General Precision and SSSC.

■■■ It should be noted that Sikina had the authority to make the decision to no-quote the NASA RFQ. In regard to the question whether Conser violated any duties owed to UAC we find it highly significant that there has been no showing that the information which Conser gave to Sikina or that Conser's conclusion was inaccurate or unreasonable under the circumstances. This, coupled with the fact that Conser did not know that Moyer and Boreen were preparing a quotation on the same RFQ at the time he was conferring with Sikina, indeed, until after the deadline on the RFQ had passed, convinces us that Conser did not wrongfully cause Vector not to bid on the NASA RFQ. Nor do we see a breach of duty in Conser's failure to suggest that Vector take exceptions to the RFQ and then quote on it, absent some showing that this was unreasonable under the circumstances and that he was aware of the intention of Boreen and Moyer to prepare their own quotation.

■■■ Nor was the failure of Conser to inform Vector that SSSC had submitted a proposal to NASA, once he had discovered that fact, a breach of any duty to UAC, since this was after the deadline for proposals and he had been guilty of no wrongdoing in regard to Vector's decision to no-quote.

■■■ Nor did Moyer breach any duty in preparing a response to an RFQ which Vector had decided to "no-quote," absent a showing that Vector's decision had been wrongfully induced. As mentioned above, we remain unpersuaded that Conser was guilty of any wrongdoing in his dealings with Sikina in regard to the NASA RFQ or that at that time he was acting in concert with Moyer. Thus, since Moyer unquestionably prepared the proposal after Vector's decision not to bid, there was no competition with Vector, for the latter was already out of the picture by its own choice.

■■■ We find further that Moyer's use of the dielectric process in the

SSSC NASA proposal was not wrongful, absent the required showing of misuse of trade secrets or of copying from the documents of his former employer, since

> " * * * [T]here is agreement among the courts that, except, where *real* trade serets are involved, an employee may compete with his former employer and use such knowledge and skill as he has developed in the former's employ. This accords with the main object of a free economy which is the basis of the industrial system. * * * "

Sarkes Tarzian, Inc. v. Audio Devices, Inc., 166 F.Supp. 250, 264 (S.D.Cal.1958), *aff'd,* 283 F.2d 695 (C.A. 9, 1960), *cert. den.,* 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed. 2d 859 (1961).

■ As the court said, in Pittsburgh Cut Wire Co. v. Sufrin, 350 Pa. 31, 35, 38 A.2d 33 (1944):

> " * * * A man's aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment, are not the property of his employer and the right to use and expand these powers remains his property unless curtailed through some restrictive covenant entered into with the employer. Williston on Contracts, § 1646 p. 4627."

### C.

*Misappropriation of Vector Property*

1. The NASA Proposal.

■ In preparing the NASA proposal Moyer admits having copied portions of a copy of an earlier proposal which Vector Division had prepared for NASA. Although there has been no showing that this material was a trade secret, Moyer's retention of the earlier Vector proposal was wrongful after the termination of his employment. It will be remembered that Moyer testified that he prepared the NASA proposal on the weekend following Friday, May 19, when he submitted his resignation to Vector. Even though he had a "right, upon the termination of [his] employment, to carry away and use the general skill or knowledge acquired during the course of employment," he did not have a right to benefit from the use of property which he had wrongfully retained after the employment. Midland-Ross Corp. v. Yokana, 293 F.2d 411 (C.A. 3, 1961). This is so even though Moyer's use of this document did not damage Vector, since Vector had decided to "no-quote" this particular NASA RFQ. Appropriate relief may be had in the form of enjoining Moyer to return the document and an accounting of such profits as he may have derived from the use of the document, if any.

2. Kindregan's Telephone List.

After his termination of employment with the Vector Division, Kindregan had his secretary type for him a list of telephone numbers and addresses, along with some names of people to contact, of companies in the solid-state industry. Kindregan testified that these names were part of his personal telephone directory. There has been some dispute as to whether this list should be characterized as a telephone list or a customer list. However, it did contain the names of customers whom Kindregan was to contact on behalf of the Vector Division in his function as head of solid-state sales.

■ Kindregan had come aboard with the Vector Department of Norden Division of UAC on February 26, 1964. From some time in 1963 until that date he had been employed with Texas Instruments, and from 1960 until 1963 with Philco Corporation, Lansdale Division. The names appearing on the list which Kindregan had his secretary type for him had been accumulated over a period of seven years. We find there was nothing unlawful in Kindregan's retaining a list which was the product of his own labors.

In Spring Steels, Inc. v. Molloy, supra, the court said, 400 Pa. at p. 358, 162 A.2d at p. 372:

> " * * * [T]he customer lists here involved were not the product of any special work on the part of the plaintiff company, nor were they confidential. The defendant, Joseph Kersch-

baum, who was particularly charged by the plaintiff with illegal use of customer lists, had been a salesman for [the plaintiff] for eight years, * * * during which time he had prepared *his own list* of all types of steel users in the Philadelphia area. It is true that while in the employ of the plaintiff company he had added to this original list, but the additions were not gained through any confidential sources of the plaintiff company. On the contrary, as the Chancellor properly found from the evidence in the case: 'The bulk of the additions made by the defendant Kerschbaum during the course of his employment by plaintiff came from information contained in trade journals and ordinary listings in the telephone directory.'" (Emphasis supplied).

3. Markoe's Retention of a Copy of the Diode Sputtering System.

█ Stephen Markoe was the engineer in charge of the thin-film section at the Vector Division. UAC alleges that he took with him when he left Vector a copy of the diode sputtering system that had been designed by Jack Dale. Although he admits this, and it was certainly not proper for him to have retained this Vector property, he testified that he does not now have a copy of the diode sputtering system. He also testified that in accordance with instructions given him by Boreen he destroyed all non-proprietary Vector documents in July of 1967. There is no evidence to the contrary. Since Markoe does not now have the copy of the diode sputtering system, and since there has been no showing as yet that SSSC profited from the retention by Markoe of this document for a period following his leaving Vector, UAC has no present right to relief based on this conduct of Markoe. Midland-Ross Corp. v. Yokana, supra.

4. Use of Vector Working Time.

█ As indicated above, the defendants were free to prepare to enter a rival business while still in the employ of the plaintiff. This does not mean, however, that they were free to do so during working hours. UAC has a property right in the services of its employes during working hours. Its employes have a duty to serve only UAC while performing the duties for which they are being paid.

█ The record indicates instances of derogations from this duty by the defendants too numerous to elaborate upon here. The proper remedy for UAC is the recovery from the defendants of the value of the services which UAC lost on account of the time not spent serving UAC. We find, however, that although the instances of time not spent serving Vector but planning SSSC are numerous on the record, they constitute so far on this record an injury to UAC of *de minimis* proportions.

## IV. CONSPIRACY

UAC also charges that the defendants were parties to an unlawful conspiracy to leave Vector Division as a team, enter into competition with it, and destroy it as a competitor. According to this theory the allegedly unlawful inducements and alleged breaches of fiduciary duties were the means by which the defendants sought to injure Vector.

█ "An unlawful conspiracy has been defined as a combination between two or more persons to do an unlawful or criminal act, or to do a lawful act by criminal or unlawful means." Noerr Motor Freight, Inc. v. Eastern Railroad Presidents Conference, 155 F.Supp. 768, 814 (E.D.Pa.1957).

Although the defendants did act in concert and, to a large degree, in secrecy, their intention was not to harm Vector or to put it out of business. They were motivated by a desire to start a new company in which they could participate both in management and in ownership.

█ UAC has characterized the conduct of the defendants as that of Mephistopheles and Faust. But the agreement between Mephistopheles and Faust, it will

be remembered, was an agreement violative of public policy.[16]

Somat Corp. v. Combs, 40 Pa.Dist. & Co. R. 2d 107, 122 (Chester Co., 1966) is right on point.

" * * * We would point out first that we can find no evidence on this record which would support a conclusion that two or more of these defendants have joined together or agreed to do an unlawful or criminal act or to do a lawful act by criminal or unlawful means. On the contrary, in our view, the evidence more readily sustains the conclusion that Combs, Craig, MacEachern, Kirkbride and Warner, being dissatisfied with the policies and methods of their employer, set out to establish a competing business which, through the application of their own ideas and industry, they hoped to make successful, even to the point, perhaps, of forcing Somat out of business. As a competing business would become more successful, those with whom it competed could be affected adversely. We do not believe and are not willing to say that such action on the part of the departing employees, or that an agreement among them to obtain such a result, can be adjudicated a conspiracy within the meaning of the definition quoted above. * * * "

■ Finally, the fact that one of the defendants was breaching a covenant not to compete does not make the otherwise lawful group action here unlawful. The defendants acted with a good faith belief, on the advice of counsel, that Boreen was not in breach of his covenant. They invested their own funds and sacrificed job security to launch a new enterprise. Nor was Boreen's participation in SSSC surreptitious. Had the defendants known that Boreen would be breaching his covenant not to compete they surely would not have taken these risks.

Under these circumstances, it would be unreasonable to conclude that a purpose of this concerted action was to have Boreen breach his covenant.

The foregoing discussion shall be considered as our conclusions of law, in addition to which we conclude specifically that the court has jurisdiction over the parties to and the subject matter of the suit.

Any statements of fact contained in the foregoing "Discussion" not specifically found in the "Findings of Fact" are nevertheless additional findings of fact.

### RELIEF

■ We have found that Boreen has violated his agreement not to compete through his activities in SSSC and that UAC is entitled to equitable relief. Consequently, Boreen must:

a. terminate his employment with SSSC;

b. divest himself of all ownership of SSSC stock;

c. cease and desist from participating in the activities of SSSC, including any assistance to SSSC in an advisory capacity; and

d. forbear from violating the terms of the agreement for a period of five years following March 1, 1967.

Richard Moyer will be ordered to return the copy of Vector's NASA proposal (Ex. P–54A).

■ Equitable relief does not lie against any of the defendants other than Boreen; nor does it lie against SSSC in this action. Save in regard to some use of Vector working time and Moyer's use of Vector's previous NASA proposal, the defendants have been guilty of no wrongs against UAC. They entered into the formation of SSSC with good faith belief, on the advice of counsel, that Boreen would not be violating his covenant were he to engage

16. "Mephistopheles:
 I will bend myself to your service in this world,
 To be at your beck and never rest nor slack;

 When we meet again on the other side,
 In the same coin you shall pay me back."
Goethe, Faust, (Oxford University Press, New York, 1951; tr. Louis MacNeice).

in the manufacture and sale of solid-state devices not connected with telemetry. The defendants were not parties to the covenant and were at all times employed by UAC at will. They were motivated by a desire to take part in the organization of a new company in which they would be owners as well as employes. To enforce the covenant against them because of Boreen's violation would be contrary to the strong policy of Pennsylvania favoring economic liberty, manifested in the *Molloy* case, supra, as well as the economic spirit of the Constitution. Cf. Thirteenth Amendment; The Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1893) (dissenting opinion of Mr. Justice Field); Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1949).

The parties are directed to agree upon and submit an appropriate decree in accordance with the foregoing opinion.