Morgan's Home Equipment Corp. *v.* Martucci, Appellant.

Argued January 7, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Franklin Poul*, with him *Bernard Wolfman* and *Wolf, Block, Schorr and Solis-Cohen*, for appellants.

*Joseph E. Gold*, with him *Jerome Charen* and *Edgar R. Einhorn*, for appellee.

OPINION BY MR. JUSTICE COHEN, November 22, 1957:

The Central Home Furnishing Co. was engaged in the installment selling of household articles through door-to-door salesmen-collectors. Each salesman was given a confidential route of cutomers to whom he sold and from whom he collected weekly payments. The contacts between salesmen and customers were on a regular and reoccurring basis.

In February, 1955, Morgan's Home Equipment Corporation purchased the assets of the Central Company. Of the $150,000 purchase price, only $25,000 was paid

for merchandise inventory; the remainder was paid for accounts receivable, customer lists and "good will." Within a month after Morgan had purchased Central, a meeting was held at which those employes of Central who were to be retained by Morgan were requested to execute an agreement wherein each employe promised for a period of one year after termination of employment not to compete with Morgan within a radius of 100 miles from Philadelphia, and not to solicit, divert or take away customers whom he had been serving. The instrument further recited that the employe would keep confidential the names and addresses of Morgan's customers, and that he would not cause any customers to withhold their patronage. The consideration stated in the agreement for these employe covenants was the taking of employment with Morgan. Additionally, the contract contained the language: "I intend to be legally bound hereby." When each employe signed the agreement he was promised, and did receive, various benefits incident to employment with Morgan including an insurance policy, a raise in wages and additional customers.

One salesman, Morris Spiller, voluntarily left Morgan's employ on April 15, without signing the contract, and immediately thereafter began a competing business under the name of Variety Sales Corporation. Two other salesmen, John Martucci and Dan Spiller, signed the restrictive agreement and continued as employes of Morgan. On May 22, Martucci left Morgan to go with Variety, and on July 30, 1955, Dan Spiller did likewise. They then began to solicit and serve the customers of Morgan on their former routes on behalf of Variety. Other collector-salesmen, all of whom had been former employes of Morgan, were hired by Variety and actively solicited the patronage of Morgan's customers.

Morgan's Home Equipment Corporation filed a complaint in equity in August, 1955, in the Court of Common Pleas No. 5 of Philadelphia County, charging Martucci and Dan Spiller with breaking their restrictive covenants, misusing secret information obtained while employes of the plaintiff and misleading customers by using forms which gave the impression that the defendants were still soliciting on behalf of Morgan. Morris Spiller was charged with conspiring with the other defendants to divert Morgan's customers and entice away its employes.

The chancellor found that the restrictive covenants lacked consideration and, hence, were unenforcible. The chancellor also concluded that a conspiracy had not been proven, and that the defendants had neither misled customers, misused confidential information, nor enticed away any of Morgan's employes. Exceptions to this adjudication and to the decree nisi which followed it were filed. The court en banc, (including the chancellor), reversed unanimously, and entered a decree enjoining defendants Martucci and Dan Spiller for one year from the termination of their employment with the plaintiff from divulging the names and soliciting the patronage of customers who became known to them by reason of their former employment. The decree further enjoined the two defendants from attempting to divert any of plaintiff's business and from persuading plaintiff's customers to refrain from continuing their patronage. All of the defendants individually and trading as Variety Sales Corporation were prohibited from using customer lists, soliciting customers, persuading customers not to patronize, attempting to divert business, enticing employes, and using deceptively similar cards and records to the detriment of Morgan. Finally, all defendants were directed to account for profits obtained as a result of the

violations of the agreement and the solicitation of plaintiff's customers. From the final decree of the court en banc the defendants prosecute these appeals maintaining that the covenants were unenforcible for lack of consideration, that the reversal of the chancellor's findings by the court en banc constituted an abuse of discretion and that the relief granted was oppressive.

## I.

### The Disclosure Of Confidential Customer Information

In many businesses, permanent and exclusive relationships are established between customers and salesmen. The customer lists and customer information which have been compiled by such firms represent a material investment of employers' time and money. This information is highly confidential and constitutes a valuable asset. Such data has been held to be property in the nature of a "trade secret" for which an employer is entitled to protection, independent of a nondisclosure contract, either under the law of agency or under the law of unfair trade practices.[1] In *Macbeth-Evans Glass Co. v. Schnelbach*, 239 Pa. 76, 85-86, 86 Atl. 688 (1913), we had occasion to discuss the nature of "trade secrets" and the reasons underlying their judicial recognition: "It may now be accepted as settled

---

[1] E.g., *Boylston Coal Co. v. Rautenbush*, 237 Ill. App. 550 (1925); *Morrison v. Woodbury*, 105 Kan. 617, 185 Pac. 735 (1919); *Witkop & Holmes Co. v. Boyce*, 112 N. Y. S. 874 (1908), aff'd, 115 N. Y. S. 1150 (1909); *Soeder v. Soeder*, 82 Ohio App. 71, 77 N.E. 2d 474 (1947); *Jewel Tea Co. v. Grissom*, 66 S. D. 146, 279 N.W. 544 (1938); See Annotations, 23 A.L.R. 420 (1923); 126 A.L.R. 758 (1940); 2 Callmann, Unfair Competition and Trade-Marks, §55.2(c) (2) (2nd ed. 1950); 1 Nims, Unfair Competition and Trade-Marks, §157 (4th ed. 1947); Restatement, Agency, §396(b) (1933). See also authorities cited in note 7 infra.

law, under the authority of English and American cases, that courts of equity if the facts warrant will restrain an employee from making disclosure or use of trade secrets communicated to him in course of a confidential employment. *The character of the secrets, if they be peculiar and important to the business, is not material.* They may be secrets of trade, . . . or any other secrets important to the business of the employer. They, however, must be the particular secrets of the complaining employer, not general secrets of the trade in which he is engaged. . . . The duty of the servant not to disclose the secrets of the master may arise from an express contract, *or it may be implied from their confidential relations.*

. . .

*"Where confidence is reposed, and the employe by reason of the confidential relation has acquired knowledge of trade secrets, he will not be permitted to make disclosure of those secrets to others to the prejudice of his employer."* (emphasis supplied)

We agree that confidential customer data are entitled to protection as a trade secret within the meaning of the *Macbeth-Evans* rule.[2]

In the present case there is no dispute that the customer data of the plaintiff company was both confidential and highly valuable, and the court en banc so found. Whether this information was embodied in

---

[2] See also *Vincent Horwitz Co. v. Cooper*, 352 Pa. 7, 41 A. 2d 870 (1945) (no injunction to restrain use of customer lists which were available through published lists of suppliers and other catalogue and sales publications); *Elliott v. Skillkrafters, Inc.*, 271 Pa. 185, 114 Atl. 488 (1921) (surreptitiously obtained lists of plaintiff's customers ordered to be returned). *Wiegand Co. v. Trent*, 122 F. 2d 920 (3rd Cir. 1941), cert. denied, 316 U. S. 667 (1942) (unless trade secrecy is involved, use of customer lists is permissible).

written lists or committed to memory is, we believe, of no significance; in either case the data are entitled to protection.[3]

All the defendants were given customer data in the course of their employment with Morgan and its predecessor,[4] and all admit to using and divulging the information subsequently in their rival employment. We hold, therefore, that independent of the covenants executed between Morgan and its former employes,[5] the lower court properly directed Martucci, Dan Spiller, and Morris Spiller to account for all profits obtained from the disclosure of confidential customer information.[6] *Macbeth-Evans Glass Co. v. Schnelbach,* supra; *Belmont Laboratories, Inc. v. Heist,* 300 Pa. 542, 151 Atl. 15 (1930).

---

[3] See *Boylston Coal Co. v. Rautenbush,* 237 Ill. App. 550 (1925) ; *Colonial Laundries v. Henry,* 48 R. I. 332, 138 Atl. 47 (1927) ; *J. L. Cooper & Co. v. Anchors Securities Co.,* 9 Wash. 2d 45, 113 P. 2d 845 (1941) ; 2 Callmann, op. cit. supra at 844.

[4] The defendants received most of their customer data in the course of their service with plaintiff's predecessor company, Central. Since Morgan succeeded to all the rights of Central, the obligations of Central's employes were transferred to Morgan. See *J. L. Cooper & Co. v. Anchor Securities Co.,* 9 Wash. 2d 45, 113 P. 2d 845 (1941) ; Cf. *Seligman & Latz v. Vernillo,* 382 Pa. 161, 114 A. 2d 672 (1955) (incorporation of former unincorporated employer doesn't alter liability of employe to employer).

[5] By the weight of authority, the presence of a non-disclosure covenant such as the one before us, does not create the right to protection but rather serves as evidence of the confidential nature of the data. *Empire-Steam Laundry Co. v. Lozier,* 165 Cal. 95, 130 Pac. 1180 (1913) ; *Todd Protectograph Co. v. Hirschberg,* 165 N. Y. S. 906 (1917).

[6] Martucci and Dan Spiller were enjoined for one year from the date of entry of the decree, February 14, 1956, from disclosing customers who became known to them during their employment. This provision, although justified, has now become moot. The same is true of that section of the decree which prohibited the defendants from soliciting the patronage of their former customers.

## II.

### The Solicitation Of Morgan's Customers

The vice of an employe's divulgence of confidential information is that the rival businessman who receives the data is enabled thereby to compete unfairly with the former employer. But it is immaterial to the employer whether unfair competition comes at the hands of a third party or directly through an employe. For this reason the law will also prevent an employe from using customer contacts as well as confidential customer information to his own advantage by soliciting the customers of his former employer.[7] Cf. *Belmont Laboratories, Inc. v. Heist,* supra, 300 Pa. at 553. Accordingly, the decree of the court below correctly required all the defendants to account for profits obtained from the solicitation of those customers of Morgan who became known by reason of employment with plaintiff and its predecessor.[8]

## III.

### The General Covenants Not To Compete For The Patronage Of The Public At Large

In the absence of an agreement between employer and employe to the contrary, the law does not prevent an employe from competing in business with his former employer after his service has terminated. However,

---

[7] *Robb v. Green,* L. R. [1895] 2 Q.B. 315 (Eng.) ; *Golden State Milk Products Co. v. Brown,* 217 Cal. 570, 20 P. 2d 657 (1933) ; *Southwest Pump & Machinery Co. v. Forslund,* 225 Mo. App. 262, 29 S.W. 2d 165 (1930) ; *Haut v. Rossbach,* 128 N. J. Eq. 77, 15 A. 2d 227 (1940), aff'd, 128 N. J. Eq. 478, 17 A. 2d 165 (1941) ; *Colonial Laundries v. Henry,* 48 R. I. 332, 138 Atl. 47 (1927) ; *J. L. Cooper & Co. v. Anchor Securities Co.,* 9 Wash. 2d 45, 113 P. 2d 845 (1941) ; 35 Am. Jur. 529-530 (1941) ; 28 Am. Jur. 306-308 (1940) ; 56 C.J.S. 484-486 (1948) ; 43 C.J.S. 755-757 (1945). See also authorities cited in note 1.

[8] See footnote 6, supra.

the restrictive agreements signed by defendants Martucci and Dan Spiller contained *general* covenants which precluded them from competing with Morgan for the trade of the public at large in addition to the *specific* covenants not to compete for the patronage of customers already acquired by Morgan.

Such general covenants not to compete present centuries old legal problems. The earliest cases were decided against the economic background of a chronic shortage of skilled workers in England, the result of the virulent epidemics of the Black Death during the fourteenth century. It was not surprising, then, that all covenants to refrain from practicing a trade were held to be void as against public policy.[9] This policy carried over into the early seventeenth century when the grants of exclusive trading privileges by the Sovereign caused widespread public indignation which broadened into a dislike for all restraints upon the free exercise of trade. However, by the eighteenth century England found itself in the midst of a new commercial era, and adjusting to changed economic conditions, the courts upheld at common law contracts in partial restraint of trade provided they were ancillary to a principal transaction, and were reasonably limited both in geographical extent and duration of time.[10]

---

[9] *The Dyer's Case*, Y. B. 2 Hen. V, Pl. 26 (1415). It appears that one loyal subject of the King had bound himself to another to refrain from practicing his trade in a particular village for a brief period; the Court observed: "The obligation is void because the condition is against the common law, and by God, if the plaintiff were present he should rot in gaeol till he paid a fine to the King." (Translation from the French by the Court).

[10] *Mitchel v. Reynolds*, 1 P. Wms. 181 (K.B. 1711). For a treatment of the historical development of contracts in restraint of trade see Carpenter, Validity of Contracts Not to Compete, 76 U. of Pa. L. Rev. 244 (1928).

This rule has come down to us as part of the present-day law of Pennsylvania. We have held that employment contracts containing general covenants by an employe not to compete after the termination of his employment are prima facie enforcible if they are reasonably limited as to duration of time and geographical extent. *Seligman & Latz v. Vernillo*, 382 Pa. 161, 114 A. 2d 672 (1955); *Plunkett Chemical Co. v. Reeve*, 373 Pa. 513, 95 A. 2d 925 (1953). General covenants are reasonably limited if they are "within such territory and during such time as may be reasonably necessary for the protection of the employer . . . without imposing undue hardship on the employee . . .". Restatement, Contracts, §516(f) (1932).[11]

The defendants urge that there is yet another requirement in Pennsylvania for the validity of general covenants not to compete. They rely upon the case of *Cleaver v. Lenhart*, 182 Pa. 285, 37 Atl. 811 (1897) for the proposition that such covenants are not enforcible unless they are supported by a real and valuable consideration, and contend that real consideration is lacking in the present case.

In the *Cleaver* case a contract for the sale of creameries was entered into and fully performed. Subsequently, a second agreement was made under seal in which the seller agreed not to compete with the purchaser within a radius of five miles from the site of the creameries for a period of three years from the date of the contract. The contract recited the purchase of the creameries as being the consideration for the agreement. This Court held that when the second agreement was made, the contract of sale had been completely ex-

---

[11] See also the extensive collection of authorities in Annotations, 41 A.L.R. 2d. 15, 53-61 (1955); 43 A.L.R. 2d. 94, 141-151 (1955).

ecuted, and that there was nothing from this first agreement which could operate as a consideration for the second, and hence, the agreement was unenforcible despite the presence of the seal.[12]

While the opinion in the *Cleaver* case was couched in terms of consideration, it is apparent that the Court was referring to the fact that the general covenant not to compete was not ancillary to any principal transaction. It has long been the rule at common law, that contracts in restraint of trade made independently of a sale of a business or contract of employment are void as against public policy regardless of the valuableness of the consideration exchanged therein. *United States v. Addyston Pipe & Steel Co.*, 85 Fed. 271, 281-82 (6th Cir. 1898), aff'd, 175 U. S. 211 (1899); *Mitchel v. Reynolds*, 1 P. Wms. 181 (K.B. 1711); Restatement, Contracts, §515(e) (1932).

Since in the case at bar the allegedly lacking consideration for the covenants was the employment relationship itself, we must inspect the instant agreement to see whether in fact it was related to the taking of employment.[13]

---

[12] While the present agreement was not under seal, it contained a statement of intent to be legally bound within the meaning of the Uniform Written Obligations Act. Act of May 13, 1927, P. L. 985, §1, 33 P.S. §6. Such language has the same effect in importing consideration as the seal on the agreement in the *Cleaver* case. See Note, 76 U. of Pa. L. Rev. 580, 584 (1928).

[13] In *O'Brien v. O'Brien*, 362 Pa. 66, 66 A. 2d 309 (1949) this Court, speaking through Mr. Justice STERN, decided that the Parol Evidence Rule was a substantive rather than evidentiary rule of law. Therefore, the failure on the part of the plaintiffs to object to the admission of the evidence tending to show lack of consideration did not constitute a waiver of objection upon appeal. However, defendants' evidence showing that the restrictive agreement was signed one month after entering into the employment relationship was properly received even though it contradicted statements

The chancellor found as a fact, that at the organizational meeting of plaintiff company, held some four weeks prior to the signing of the restrictive covenants, Central's employes were retained on a provisional basis, and regular employment was not offered until the time of the signing of the covenants. Nothing in the record impels us to alter his conclusions on this issue. We believe that the phrase "taking of employment" denoted the entering into a regular employment relationship in contradistinction to provisional employment. Since this relationship was not established until the time of the signing of the agreement we arrive at the determination that the general covenants not to compete were ancillary to the employment relationship.[14]

---

contained in the restrictive agreement, because the Parol Evidence Rule does not prevent the denial of the truth of *statements of facts* contained in a written agreement, Restatement, Contracts, §82 (1932) ; 1 Williston, Contracts, §§115(A), 115(B) (Rev. ed. 1937) ; 20 Am. Jur. 973-76 (1939) ; 32 C.J.S. 869-872 (1942). Accord: *Edmundson's Estate*, 259 Pa. 429, 435, 103 Atl. 277 (1918), but operates rather to prohibit the addition to, subtraction from, or contradiction of the *promises* and *agreements* made in a written contract by persons seeking to avoid its terms. *Grubb v. Rockey*, 366 Pa. 592, 79 A. 2d 255 (1951). Plaintiff's evidence showing additional consideration in *order to uphold the validity of the agreement* also did not violate the Parol Evidence Rule, and was therefore properly admitted.   However, since the validity of the covenant not to compete turns on the question of relationship to a principal transaction rather than the question of sufficiency of consideration, the evidence is not helpful to plaintiff's case.

14 The taking of employment which is terminable at will affords a sufficient "principal transaction" or "consideration" to support a restrictive agreement made by an employe. *Wark v. Ervin Press Corp.*, 48 F. 2d 152 (7th Cir. 1931) ; *Wisconsin Ice & Coal Co. v. Lueth*, 213 Wis. 42, 250 N.W. 819 (1933) ; 5 Williston, Contracts, pp. 4611-12 (Rev. ed. 1937). Annotation, 98 A.L.R. 963, 984 (1935). It follows that the covenants not to solicit customers, not to divulge customer information, not to attempt to persuade cus-

We, therefore, proceed to review the "reasonableness" of the covenants in the light of the need of the employer for protection and the hardship of the restriction upon the employes.

General covenants not to compete which are ancillary to the sale of a *business* serve a useful economic function; they protect the asset known as "good will" which the purchaser has bought. Indeed, in many businesses it is the name, reputation for service, reliability, and the trade secrets of the seller rather than the physical assets which constitute the inducements for a sale. Were the seller free to re-enter the market, the buyer would be left holding the proverbial empty poke. When restrictive covenants are limited to the area of potential competition with the purchaser and limited in time to the period required for the purchaser to establish his own customer following, then they are enforcible although a partial restraint upon the free exercise of trade.

Quite different reasons motivate the upholding of general covenants not to compete which are ancillary to employment. An employe may receive specialized training and skills, and learn the carefully guarded methods of doing business which are the trade secrets of a particular enterprise. To prevent an employe from utilizing such training and information in competition with his former employer, for the patronage of the public at large, restrictive covenants are entered into. They are enforced by the courts as reasonably necessary for the protection of the employer. See *Arthur Murray Dance Studios, Inc. v. Witter,* 62 Ohio L. Abs. 17, 105 N.E. 2d 685, 694-99, 708-711 (1952); 3 Pomeroy, Equity Jurisprudence, §934c (5th ed. 1941). A general cove-

---

tomers to withhold their patronage, and not to divert business may all be. enforced by the plaintiff.

nant not to compete, however, imposes a greater hardship upon an employe than upon a seller of a business. An employe is prevented from practicing his trade or skill, or from utilizing his experience in the particular type of work with which he is familiar. He may encounter difficulty in transferring his particular experience and training to another line of work, and hence his ability to earn a livelihood is seriously impaired. Further, the employe will usually have few resources in reserve to fall back upon, and he may find it difficult to uproot himself and his family in order to move to a location beyond the area of potential competition with his former employer. Contrarywise, the mobility of capital permits the businessman to utilize his funds in other localities and in other industries. In view of this greater hardship imposed upon an employe, general covenants not to compete which are ancillary to employment will be subjected to a more, stringent test of reasonableness than that which is applied to such restrictive covenants ancillary to the sale of a business. Restatement, Contracts, §515(b), comment b (1932); Annotations, 43 A.L.R. 2d 94, 111 (1955), 41 A.L.R. 2d 15, 30 (1955).

The record in the present case discloses no evidence that the employes received any special training or insight into methods of doing business of the plaintiff company which would make it inequitable to have them compete with the plaintiff for the patronage of the public at large. Although the defendants obtained confidential customer information, Morgan was adequately protected by the decree which enjoined disclosure and solicitation, and so prevented the former employes from benefiting from their customer contacts and knowledge. Consequently, under these facts we find that the general covenants not to compete are not reasonably necessary for the protection of Morgan and constitute an

undue hardship upon its former employes. It follows, therefore, that these particular covenants contained in the restrictive agreements are enforcible against Martucci and Dan Spiller only to the extent of preventing them from competing for the patronage of Morgan's existing customers and their duty to account for breach of these covenants will be limited accordingly. Cf. *Plunkett Chemical Co. v. Reeve,* supra (territorial limitation imposed); *Seligman & Latz of Pittsburgh, Inc. v. Vernillo,* supra (restriction on accepting employment with competing businesses limited to positions similar in nature to former job).

## IV.
### Inducing Breach Of Contract

Defendant Morris Spiller admits that he offered employment and ultimately hired the other defendants with knowledge that they had signed restrictive agreements, and that they would be acting inconsistently with the covenants contained therein in the course of their employment. One who intentionally interferes with an existing contractual relation is subject to liability for the breach of the contract. See *Caskie v. Philadelphia Rapid Transit Co.,* 321 Pa. 157, 184 Atl. 17 (1936); 2 Callmann, Unfair Competition & Trade Marks, §33.4(d) (2nd ed. 1950); Prosser, Torts, §106 (2nd ed. 1955). Spiller asserts no privilege for inducing the breach of the covenants not to divulge confidential information, not to solicit or compete for the patronage of Morgan's customers, not to attempt to persuade customers to withhold their patronage, and not to divert Morgan's business, and he will be enjoined from continuing his unlawful conduct.

## V.
### The Enticement Of Morgan's Employes

The systematic inducing of employes to leave their present employment and take work with another is un-

lawful when the purpose of such enticement is to cripple and destroy an integral part of a competitive business organization rather than to obtain the services of particularly gifted or skilled employes. So also, when the inducement is made for the purpose of having the employes commit wrongs, such as disclosing their former employer's trade secrets or enticing away his customers, the injured employer is entitled to protection. See *Albert Pick-Barth Co. v. Mitchell Woodbury Corp.*, 57 F. 2d 96 (1st Cir.), cert. denied, 286 U. S. 552 (1932) ; 2 Callmann, op. cit. supra, §33.1(a).

The defendants argue that there is no evidence to justify the finding of the court en banc, in the present case, of the enticement of Morgan's employes by the defendant Morris Spiller. The chancellor had concluded that there had been no illegal enticement of plaintiff's employes, although he found as a fact that all the employes of the defendant Variety Corporation were former employes of plaintiff. In *Belmont Laboratories Inc. v. Heist,* 300 Pa. 542, 151 Atl. 15 (1930), we said that in those cases which depend in large degree upon the credibility of witnesses whom the chancellor saw and heard, and whose testimony for that reason he is best able to weigh, the court en banc can properly disregard his findings only in a clear case, and then by putting upon the record its reasons for so doing. In the *Belmont* case, however, the chancellor who made the original finding did not sit on the court en banc when it made its determination. In the present case the court en banc which reversed the finding as to illegal enticement included the chancellor. "It is the final conclusion of the chancellor which is to be considered. Frequently he modifies the facts as first declared, where mistake is called to his attention, and the last statement made is to be treated as his deliberate conclusion." *Piacentino v. Young,* 272 Pa. 556, 560, 116

Atl. 407 (1922). For this reason, the findings of the court en banc are subject to the usual rule, i.e., they will not be disturbed on appeal if supported by adequate evidence. *Eways v. Reading Parking Authority,* 385 Pa. 592, 124 A. 2d 92 (1956). We are convinced after careful examination of the entire record that the defendant Morris Spiller engaged in the systematic enticement of plaintiff's employes for the purpose of disrupting its business and obtaining its confidential customer information. It follows that there was no abuse of discretion by the lower court in granting relief from such practices.

## VI.

### The Deceptively Similar Cards, Order Books And Forms

The trading on another's business reputation by use of deceptive selling practices or other means is enjoinable on the grounds of unfair competition. If the particular use in question is reasonably likely to produce confusion in the public mind, equity will restrain the unfair practice and compel an accounting of the profits gained thereby. *Thomson-Porcelite Co. v. Harad,* 356 Pa. 121, 51 A. 2d 605 (1947); *Stroehmann Bros. Co. v. Manbeck Baking Co.,* 331 Pa. 96, 200 Atl. 97 (1938); 87 C.J.S. 325-333 (1954).

The defendants admit that the customer cards of Variety Corporation were similar in general arrangement, color and form to those used by Morgan. The court en banc, who had the opportunity of viewing the documents in question, found that the cards were misleading. Nothing in the record moves us to upset their finding. We note that no great hardship is imposed upon the defendants to change their documents so that they are less similar to those employed by the plaintiff.

## VII.
### The Relief Granted

The defendants complain that the court below abused its discretion in permanently enjoining them from soliciting and diverting customers of Morgan, and persuading Morgan's customers not to continue their patronage. We agree with their contention that the injunction, being based upon principles of general equitable relief available for unfair competition,[15] is too broad. We believe that the decree of the court below ought to be modified so as to provide for future competition with the plaintiff corporation.

The decree of the Court of Common Pleas No. 5 of Philadelphia County is modified in accordance with this opinion, and as modified affirmed. Costs to be paid by the appellants.

---

[15] See 2 Callmann, op. cit. supra, §59.1; 4 Callmann, op. cit. supra, §§88.1, 88.5.