## PERFECT SUBSCRIPTION COMPANY

v.

### Franklin KAVALER et al.

### Civ. A. No. 76-3025.

United States District Court,
E. D. Pennsylvania.

Feb. 16, 1977.

*Roe v. Conn,* 417 F.Supp. 769 (U.S.D.C., M.D. Ala.1976).

Stuart H. Savett, Philadelphia, Pa., for plaintiff.

S. David Fineman, Philadelphia, Pa., for Kavaler & Liberty Subscription Agency, defendants.

## MEMORANDUM AND ORDER

BRODERICK, District Judge.

Plaintiff, Perfect Subscription Company, a Delaware corporation with its principal

place of business in New Jersey, brings this action to enjoin defendants, Franklin Kavaler, a citizen and resident of the Commonwealth of Pennsylvania, and Liberty Subscription Agency, Inc. ("Liberty"), a Pennsylvania corporation with its principal place of business in Pennsylvania, from: (1) soliciting business from supervisors and telephone sales representatives who are and/or were working with the plaintiff, and (2) from using, directly or indirectly, expires and renewal files which are in the possession of these supervisors and telephone sales representatives. Presently before the Court is plaintiff's motion for a preliminary injunction.[1] For the reasons hereinafter discussed, plaintiff's motion for a preliminary injunction is denied.

Plaintiff, Perfect Subscription Company, a wholly owned subsidiary of Cadence Industries Corporation, is divided into five divisions of which the Perfect Telephone Plan is one. Through this division of the corporation, plaintiff is presently and has been for many years engaged in the business of soliciting magazine subscriptions by telephone. Plaintiff is authorized by the publishers of certain magazines to solicit subscriptions and renewals of subscriptions. Plaintiff operates throughout the United States; it directly conducts activities in the Northeast and the Southwest regions, and operates through franchisees in the other regions. Plaintiff has supervisors who, with its aid, recruit and train telephone sales representatives. An attempt is made to obtain persons who have previously done this type of work. The telephone sales representatives and sometimes the supervisors telephone prospective customers for the purpose of soliciting subscriptions and renewals of subscriptions to certain magazines. Both transact business from their own homes. Plaintiff does not require that they work any set hours, but it does suggest hours which it feels would be most conducive to making sales. The supervisors and telephone sales representatives are paid on a straight commission basis; plaintiff does not withhold taxes or workmen's compensa-

tion from them, nor does it supply them with insurance or retirement benefits. Some supervisors and telephone sales representatives, while continuing to operate with plaintiff, have, over the years, processed some of their subscription sales through competing companies.

Shortly before a subscription expires, the publisher of a magazine generally sends the subscriber one or more renewal notices. In the event the publisher is unable to obtain a renewal subscription, many publishers furnish lists of their former subscribers ("expires") to independent solicitation businesses, such as plaintiff, which, in the hope of earning a commission, attempt to induce the former subscriber to renew the subscription. Some publishers give more than one company its list of "expires".

Plaintiff gives the expire list furnished it by the publishers to the supervisor of the area in which the subscriber lives. The supervisor distributes the expire list to a telephone sales representative. The telephone sales representative is not limited to calling names from the expire lists, but often calls people from the telephone directory, or other community listings, soliciting subscriptions. The probability of obtaining a renewed subscription from a reasonably current expire list is about ten out of every hundred calls. The chances of making a sale to a person selected at random from the telephone directory is about one or two out of every hundred calls. Plaintiff provides credit facilities through which to clear sales, though many sales are made on a cash basis.

After the sale is made, the telephone sales representative writes up the order and sends it to the supervisor who relays it to the plaintiff. The telephone sales representative maintains a record of the sale in a "renewal file". Prior to the expiration of the renewed subscription, relying on the renewal file, the telephone sales representative again telephones the subscriber to obtain another renewal. The probability of the telephone sales representative obtaining

---

1. The Court had previously declined to issue a temporary restraining order in this matter.

this second renewal is about seventy-five out of every hundred calls.

When first recruited, the telephone sales representative is told of the importance of building and maintaining a renewal file. In many cases, these renewal files have been built up over a period of many years. Whenever a supervisor or a telephone sales representative ceases working with the plaintiff, an attempt is made to retrieve the expire lists and renewal files. In the past these attempts were generally successful.

Defendant, Frank Kavaler, joined the legal staff of the predecessor of Cadence Industries Corporation in 1963, became secretary and general counsel of a sister company of plaintiff in 1967, and secretary and general counsel to plaintiff in 1968. He became vice president for administration of plaintiff in 1969, and in 1971, became the chief operating officer of the Perfect Telephone Plan. In this latter capacity, he was directly responsible for the recruiting of supervisors. Mr. Kavaler had no written contract of employment with plaintiff, nor had he signed any agreement which restricted his freedom to compete with plaintiff upon the termination of his employment. In early July, 1976, he resigned effective July 31, 1976. Shortly thereafter, he incorporated and became the president and sole shareholder of the defendant, Liberty, a corporation engaged in the business of soliciting magazine subscriptions by telephone. There is no credible evidence in this record that Mr. Kavaler, prior to terminating his employment, solicited any supervisors or any publishers in an effort to obtain business for Liberty, nor that he took any files or other physical property of the plaintiff with him when he resigned. The record is convincing, however, that after he left plaintiff's employ, Mr. Kavaler, on behalf of Liberty, did actively solicit business from about fifty-five of the sixty-five supervisors who worked with plaintiff or its franchisees across the country. Some of these supervisors began to clear all their subscriptions through Liberty, while others gave it none

or only a part of their subscriptions. About 75% of Liberty's business up to the present has come from these supervisors. Liberty has been paying a higher commission rate than plaintiff.

Plaintiff had approximately twenty-five supervisors in the Northeast and Southwest regions of the country who accounted for approximately $1,506,000 in magazine subscription sales in 1975. Of these twenty-five supervisors, five are now dealing with Liberty and have ceased dealing with the plaintiff. These five supervisors accounted for approximately $382,000 of such sales in 1975, or 25.4% of plaintiff's total sales in the aforesaid regions in 1975. Plaintiff has replaced only one of these five supervisors. It is, however, telephoning prospective subscribers in these areas directly via WATS lines from Philadelphia, the home office of its telephone plan.[2]

Since Mr. Kavaler's resignation in July, 1976, plaintiff has suffered a decline in sales volume of more than 25%. This decline is not due solely to the activities of Mr. Kavaler on behalf of Liberty. This significant decline in sales volume is also attributable to the decision of *Ladies Home Journal* to eliminate all telephone sales solicitation and *TV Guide's* decision to terminate making its expire lists available to plaintiff. Plaintiff had gross sales in 1975 of fifty-five million dollars. If Liberty's sales continue at their present volume, its gross sales for this year will be about one million dollars. The record, at this stage, contains no credible evidence that Mr. Kavaler or Liberty conspired with anyone to violate the antitrust laws.

 To obtain a preliminary injunction, the moving party must demonstrate (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir. 1975). *See also, Ammond v. McGahn*, 532 F.2d 325 (3d Cir. 1976). The district court has broad discretion, since its task involves weighing the

2. Plaintiff maintains its own renewal files, duplicating to some extent the files maintained by its supervisors and telephone sales representatives.

benefits and burdens that granting or denying the injunction will have on each of the parties and the public. *Penn Galvanizing Company v. Lukens Steel Co.,* 468 F.2d 1021, 1023 (3d Cir. 1972); *North Penn Oil & Tire Co. v. Phillips Petroleum Co.,* 358 F.Supp. 908, 919 (E.D.Pa.1973).

After reviewing plaintiff's complaint, amended complaint and motion for preliminary injunction, it appears that plaintiff seeks a preliminary injunction in this case on the basis of the following allegations:

(1) that Mr. Kavaler breached a fiduciary duty owed plaintiff in that prior to his resignation, and while using plaintiff's assets, he: (a) solicited plaintiff's supervisors and telephone sales representatives as well as publishers of magazines on behalf of a magazine subscription business which he intended to establish (Liberty); and (b) intentionally failed to obtain from plaintiff's supervisors and telephone sales representatives written agreements that all property furnished to or developed by them in the course of their work was and remained the property of the plaintiff;

(2) that Mr. Kavaler, on behalf of Liberty, is soliciting business from plaintiff's supervisors and telephone sales representatives knowing that they are using plaintiff's expires and renewal files which are in their possession, and is thereby competing illegally and unfairly with the plaintiff.

(3) that Mr. Kavaler, on behalf of Liberty, systematically contacted plaintiff's supervisors pursuant to a conspiracy, the purpose and effect of which was to restrain trade, eliminate plaintiff as a competitor in the magazine subscription solicitation business, and appropriate for itself plaintiff's business in violation of the antitrust laws.

In making the determination as to whether the plaintiff has demonstrated a reasonable probability of success on the merits, we shall consider separately the evidence presented as to each of the plaintiff's allegations. At this stage of the litigation, the plaintiff has failed to establish by credible evidence a reasonable probability that it will succeed in proving that Mr. Kavaler, while still in the employ of the plaintiff, breached a fiduciary duty which he owed the plaintiff by soliciting supervisors and telephone sales representatives who were dealing with the plaintiff, and by soliciting publishers of magazines in order to obtain business for Liberty, the magazine subscription solicitation business which he intended to establish after his departure from the plaintiff. As we heretofore pointed out, there is no credible evidence in this record which would serve as a basis for finding that Mr. Kavaler, while still employed by the plaintiff, solicited any supervisors or any publishers in an effort to obtain business for Liberty. The Court further finds that at this stage of the litigation, the plaintiff has failed to establish by sufficient credible evidence a reasonable probability that it will succeed in proving that Mr. Kavaler, while employed by the plaintiff, intentionally failed to obtain a written agreement from supervisors and telephone sales representatives that all property furnished to or developed by them was the property of the plaintiff. Although there was testimony that some supervisors had in the past been required to enter into such written agreements, there is no evidence in the record that Mr. Kavaler intentionally failed to obtain such agreements; nor was any evidence presented that it was the plaintiff's policy or procedure to obtain such agreements during the period that Mr. Kavaler headed its Perfect Telephone Plan.

In connection with the plaintiff's allegation that Mr. Kavaler, on behalf of Liberty, solicited business from plaintiff's supervisors and telephone sales representatives knowing that they were using files developed while working with the plaintiff, the record shows and the Court finds that this is exactly what Mr. Kavaler has been doing since he resigned from the plaintiff. However, such evidence does not support a conclusion that the plaintiff has established a reasonable probability that it will succeed in proving that Mr. Kavaler, on behalf of Liberty, has engaged in illegal or unfair competition.

In connection with the claim of unfair competition, jurisdiction in this case is based upon diversity, and all parties are in agreement that it is the law of Pennsylvania which the Court must apply in making the determination as to whether Mr. Kavaler and Liberty are free to compete as they have been doing, or whether the law makes it illegal for him and his corporation to solicit business from the supervisors and telephone sales representatives in the manner set forth in this record.

■ Mr. Kavaler had no written contract of employment with the plaintiff, nor was he bound by any covenant not to compete with it. He was free to compete. The question is presented, however, as to whether Mr. Kavaler was free to solicit business from supervisors and telephone sales representatives who had been dealing with his former employer. Inducing an employee to terminate an employment at will is not illegal provided the only purpose is to secure the services of that employee. *Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy*, 415 Pa. 276, 203 A.2d 469, 471 (1964); *see also, Republic Systems and Programming, Inc. v. Computer Assistance, Inc.*, 440 F.2d 996, 1000–01 (2d Cir. 1971); *Motorola, Inc. v. Fairchild Camera and Instrument Corp.*, 366 F.Supp. 1173, 1180–81 (D.Ariz.1973). However, soliciting employees to terminate their employment at will can become illegal where the purpose is to injure the former employer, or obtain the trade secrets of the former employer. *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838, 847 (1957); *see also, United Aircraft Corporation v. Boreen*, 284 F.Supp. 428, 443 (E.D.Pa.1968), *aff'd*, 413 F.2d 694 (3d Cir. 1969). As we have heretofore pointed out, both the supervisors and the telephone sales representatives maintain files which show the expiration date of the customer's subscription. The list of expires obtained by the plaintiff from the publishers and furnished by the plaintiff to the supervisors and by the supervisors to the telephone sales representatives, appears to be the foundation upon which most of these renewal files have been built. In order for

defendants' operations to fall into the category of illegality under the law of Pennsylvania, these files would have to constitute the "trade secrets" of the plaintiff. Pennsylvania courts have held that customer lists do constitute trade secrets in some circumstances but not in others. In *Morgan's Home Equipment Corp. v. Martucci, supra*, the leading Pennsylvania case, the Pennsylvania Supreme Court upheld an injunction restraining former employees, most of whom had signed agreements restricting their activities after their employment ceased, and who after ceasing employment had set up a competing door-to-door home furnishings sales business, from using the former employer's customer lists. The Court noted:

> [i]n many businesses, permanent and exclusive relationships are established between customers and salesmen. The customer lists and customer information which have been compiled by such firms represent a material investment of employer's time and money. This information is highly confidential and constitutes a valuable asset. Such data has been held to be property in the nature of a "trade secret" for which an employer is entitled to protection, independent of a non-disclosure contract, either under the law of agency or under the law of unfair trade practices. . . .

> It may now be accepted as settled law . . . that courts of equity if the facts warrant, will restrain an employee from making disclosure or use of trade secrets communicated to him in the course of a confidential employment. *The character of the secrets, if they be peculiar and important to the business, is not material.* They may be secrets of trade, . . . or any other secrets important to the business of the employer. They, however, must be the particular secrets of the complaining employer, not general secrets of the trade in which he is engaged . . .

136 A.2d at 842 (quoting in part from *Macbeth-Evans Glass Co. v. Schnelbach*, 239 Pa. 76, 86 A. 688, 690 (1913)) (footnote omitted).

In *Wexler v. Greenberg*, 399 Pa. 569, 160 A.2d 430 (1960), the Court refused to enjoin the defendant from disclosing and using certain formulas and processes. In that case, the defendant had signed no restrictive agreement with his former employer. The Court noted that this was not the usual misappropriation of a trade secret case in which an employer discloses to his employee a pre-existing trade secret so that the employee may duly perform his work.

> In such a case, the trust and confidence upon which legal relief is predicated stems from the instance of the employer's *turning over to the employee* the pre-existing trade secret. It is then that a pledge of secrecy is impliedly extracted from the employee, a pledge which he carries with him even beyond the ties of his employment relationship.

*Id.* at 434. In *Wexler*, the employer had not given the employee any trade secrets. Rather, the employee had developed them on his own. In such a situation, the Court held that in order for the former employer to enjoin the defendant's use of these trade secrets, in the absence of a restrictive agreement, it must show that the "nature of employment relationship itself gave rise to a duty of nondisclosure." *Id.* In analyzing the relationship that the defendant had with his former employer, the Court found that the formulas

> were merely the result of [defendant's] routine work of changing and modifying formulas derived from competitors. . . [and] were fruits of Greenberg's own skill as a chemist without any appreciable assistance by way of information or great expense or supervision by [plaintiff], outside of the normal expenses of his job. Nor can we find anything that would indicate to [defendant] that these particular results were the goal which [plaintiff] expected him to find for its exclusive use. The Chancellor's finding that [defendant] knew at all times that it would be prejudicial and harmful to [plaintiff] for the formulas to be disclosed merely shows that [defendant] knew the value of his

finds and the harmful effects that competition by similar products could bring. *Id.* at 436–7.

In *Spring Steels, Inc. v. Molloy, et al.*, 400 Pa. 354, 162 A.2d 370 (1960), the Court again refused to enjoin defendants, five former employees of the plaintiff, from entering into a competing business and using plaintiff's customer lists in its new business. The Court pointed out:

> the customer lists here involved were not the product of any special work on the part of the plaintiff company, nor were they confidential. The defendant, Joseph Kerschbaum, who was particularly charged by the plaintiff with illegal use of customer lists, had been a salesman for Spring Steels, Inc. for eight years, but prior to his employment he had been a general steel salesman for from ten to twelve years, during which time he had prepared his own list of all types of steel users in the Philadelphia area. It is true that while in the employ of the plaintiff company he had added to this original list, but the additions were not gained through any confidential sources of the plaintiff company. On the contrary, as the Chancellor properly found from the evidence in the case:
>
> > "The bulk of the additions made by defendant Kerschbaum during the course of his employment by plaintiff came from information contained in trade journals and ordinary listings in the telephone directory."

*Id.* at 372.

In *Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy*, 415 Pa. 276, 203 A.2d 469 (1964), the Court reversed a lower court's grant of injunctive relief in a case in which milkmen left their former employer and went to work for a competitor. Though they took no written customer lists with them, they continued to call on the customers which they had previously serviced while working for the plaintiff. The Court, pointing out that there was no restrictive agreement involved, went on to hold:

> Route listings in the retail dairy industry cannot be considered as trade secrets so

as to enjoin their use under common law principles. . . . It is thus apparent, after brief reflection, that these lists are generally not the type secrets which require equitable preservation. Equity will not protect mere names and addresses easily ascertainable by observation or reference to directories. . . . 203 A.2d at 472–3. (footnote omitted).

Finally, in *Van Products Co. v. General Welding and Fabricating Co.*, 419 Pa. 248, 213 A.2d 769 (1965), the Court refused to enjoin defendant, a former employee of plaintiff, from making, advertising, and selling air driers. The Court stated that

[a]s with any other trade secret, for customer information to be protectible it must be a particular secret of the business, of value to the employer and wrongfully appropriated by the employee. In the present case, the actual lists were merely distillations of commercial lists created from the very general knowledge that users of compressed air are potential customers for air driers. In this respect, these customer lists are in no way secret.

. . .

*Id.* at 777.

■ When one analyzes these cases, it becomes apparent that the Supreme Court of Pennsylvania, in making the determination of whether a customer list constitutes a trade secret, places considerable emphasis on the following factors: (1) by whom the list was developed; (2) the expense and effort expended by the employer in developing the list; (3) the confidential nature of the list—one indication of which is whether the employer sought non-disclosure or non-competition agreements with the employee; and (4) the ease with which others in the industry can obtain such information.

As this record shows, a renewal file is a basic tool of the trade for telephone solicitation of magazine subscriptions. In most cases, they were developed through the efforts of individual telephone sales representatives over several years by calling names on the expire lists sent them by plaintiff or other solicitation agencies, and by calling names found in telephone directories and other community listings.. These files were compiled with little aid, direction, or supervision from the plaintiff, and its investment in the files was very small, limited to costs incurred by the plaintiff in distributing expire lists. Most publishers of magazines in the past have furnished such expire lists at no cost to companies such as the plaintiff. Aside from expires, supervisors and telephone sales representatives developed their own renewal files. They were under no contractual obligation to deal exclusively with plaintiff; nor did plaintiff deem this material so sensitive that it sought non-competition agreements from the supervisors and telephone sales representatives. Moreover, the information which plaintiff distributed to the supervisors, the expires, did not constitute confidential information. The lists of expires were readily obtainable by the plaintiff's competitors. One example of this was that Liberty obtained a list of expires from a publisher which previously had not distributed its lists to plaintiff. Plaintiff demanded and obtained the same list from the publisher. And as heretofore pointed out, plaintiff actively recruited supervisors and telephone sales representatives who had formerly cleared through other solicitation agencies, one purpose of which was to gain the benefits of their renewal files, demonstrating that it did not view these renewal files as confidential material.

■ It is our determination, on the basis of the law of Pennsylvania, and the record before us, that the files which the telephone sales representatives and the supervisors had built up over their period of dealings with the plaintiff, are not trade secrets. A similar conclusion was reached by a California Superior Court in *Sierra Circulation Company, Inc. v. Maybell, et al.*, No. 344575 (Santa Clara County, February 9, 1976), wherein the court, in a case in which the Perfect Subscription Co. (plaintiff in this action) was a third-party defendant, found that "the names and addresses of subscribers to magazines are well known to the trade and to subscription agencies, and hence the list of customers is not a trade secret or confidential information."

We therefore hold that the plaintiff has failed to establish at this preliminary injunction stage of the litigation a reasonable probability that it will succeed in proving that Mr. Kavaler and/or Liberty competed illegally or unfairly.

In arriving at the conclusion that under Pennsylvania law these renewal files are not trade secrets, we are not determining whether these files are the property of the plaintiff or the property of the supervisors and telephone sales representatives. There is evidence in this record that in some instances there were agreements concerning the ownership of the file, whereas in many situations, there were no such agreements. In addition, the record shows that prior to establishing a working relationship with the plaintiff, some supervisors and telephone sales representatives had built up their own files. It therefore appears that a legal determination as to the ownership of these files may require evidence as to the circumstances surrounding each set of files.

Finally, as to the plaintiff's allegation that the defendants systematically contacted the plaintiff's supervisors and telephone sales representatives pursuant to a conspiracy to restrain trade, eliminate plaintiff as a competitor and appropriate for itself plaintiff's business in violation of the antitrust laws, there is no credible evidence upon which this Court can conclude that there is a reasonable probability that the plaintiff will succeed in proving such a violation of the antitrust laws. This Court is aware of the cases holding that the Sherman Act [3] is violated whenever there is proof of a conspiracy intended to eliminate the plaintiff as a competitor by pirating its employees and stealing its trade secrets. *See Perryton Wholesale, Inc. v. Pioneer Distributing Co. of Kansas, Inc.*, 353 F.2d 618 (10th Cir. 1965); *Atlantic Heel Co., Inc. v. Allied Heel Co., Inc.*, 284 F.2d 879 (1st Cir. 1960); *Albert Pick-Barth Co., Inc. v. Mitchell Woodbury Corp.*, 57 F.2d 96 (1st Cir. 1932); *C. Albert Sauter Co., Inc. v. Richard S. Sauter Co., Inc.*, 368 F.Supp. 501 (E.D.Pa. 1973). However, plaintiff has not presented any credible evidence of any such conspiracy.

Although the plaintiff may suffer irreparable injury as a result of the defendants' competitive practices, such irreparable injury does not provide a legally sufficient basis for this Court to grant a preliminary injunction. The plaintiff has failed to demonstrate a reasonable probability of eventual success on the merits, and since this is an essential element for the issuance of a preliminary injunction, the Court must conclude that a preliminary injunction is inappropriate in this case.

This Memorandum is in lieu of findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.