D. Dennison FINCKE, Plaintiff,

v.

PHOENIX MUTUAL LIFE INSURANCE COMPANY and Eugene W. Christy, its Agent, Defendant,

v.

D. Dennison FINCKE, Counterclaim Defendant.

Civ. A. No. 76–1275.

United States District Court, W. D. Pennsylvania.

March 31, 1978.

William J. Chapas, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, Pittsburgh, Pa., for plaintiff.

Alexander Black, and Lewis U. Davis, Jr., Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for defendant.

OPINION

SNYDER, District Judge.

In Count I of this Complaint, D. Dennison Fincke sues his last employer, Phoenix Mutual Life Insurance Company (Phoenix), for failing to pay him allegedly past due commissions and overrides for the period of August, 1973 through September 15, 1976, amounting to $183,400.00 and, in addition, asks for punitive damages. In Count II,

Fincke seeks damages from Eugene W. Christy as the individual who induced him to leave his prior employment with Mutual Benefit Life Insurance Company (Mutual) and then unlawfully and intentionally interfered with the Phoenix-Fincke employment contract. Fincke seeks damages from Phoenix as Christy's employer for lost future compensation during Fincke's work expectancy and from Phoenix for failure to pay disability payments. Summary Judgment Motions have been presented by Christy, by Phoenix as to Fincke's claim for punitive damages, and by Phoenix as to Fincke's claims in Count II. In addition, Phoenix also asks summary judgment on its Counterclaim against Fincke in which it says it may be held liable in a suit by All Eastern Insurance Agency, Inc. growing out of Fincke's actions while he was in its employ. The Summary Judgment Motions of both Defendants will be granted as to the Plaintiff's Complaint for punitive damages and tortious interference with the contract, and will be denied as to the Phoenix Counterclaim.

## I.

Phoenix is engaged in providing life, health and accident insurance for individuals and groups of individuals, such as the employees of an employer or a group of employers. Phoenix sells group insurance through its licensed soliciting agents (employees who primarily sell Phoenix policies), its licensed brokers (independent agents who have, in a particular instance, sold a Phoenix policy), and its licensed group sales personnel (employees who specialize in selling Phoenix group insurance). Its group business was organized on a regional basis under a Vice President, Eugene W. Christy, who, in turn, reported to Dennis Hardcastle, Senior Vice President, who was responsible *inter alia* for Phoenix's Group Sales Division and Agency Department.

Region Six of the Group Sales Division is located in Pittsburgh, Pennsylvania, and was originally headed by Jerry F. Campbell. By the summer of 1972, Campbell was slated for a position at the home office, and Phoenix was looking for his replacement. The responsibility for finding the replacement rested with Christy and in August of 1972, he orally offered the job to D. Dennison Fincke. Fincke accepted the position and on September 25, 1972 became a Phoenix employee. On February 14, 1973, Fincke signed a letter-contract of employment, which stated in pertinent part (Exhibit A to Complaint):

"2. *Compensation*

You will receive a monthly advance. The amount of the advance will be changed periodically according to the business produced and credits earned.

Against this advance will be credited:

(a) Commissions and service fees earned by you in accordance with current Company schedules and practices. This includes both commissions and service fees on all Company lines, including Group, Pensions, Ordinary and Individual A & H business.

(b) Group Supervisory credits earned by you in accordance with current Company schedules and practices.

3. *General Conditions*

\* \* \* \* \* \*

(f) *TERMINATION.* The employment relationship created by this Agreement shall terminate upon written notice of termination by either you or the Company, delivered personally, or mailed to the other party. If not terminated prior thereto, this Agreement shall terminate on your death. In the event of termination any commissions and service fees accrued prior to termination shall be applied against the total advance paid to the date of termination. In the event such commissions and service fees exceed the total advance paid, such excess will be paid to you or, in the event this Agreement is terminated by your death, to your executor or administrator. No commissions or service fees shall accrue as credits against the total advance or otherwise become due or payable under this Agreement, with respect to any premiums due or payable on or after the date of termination of this Agreement, except for

vested commissions which may accrue subsequent to termination of this Agreement under the terms of any A3 Commission Contract that may be in effect with the Company.

(g) *PRIOR CONTRACTS.* This Agreement shall take effect as of *September 25, 1972* and shall terminate any previous Agreement or other contract of agency except any A3 Commission Contract that may be in effect with the Company."

Prior to entering Phoenix's employ, Fincke had been employed by Mutual as a group insurance salesman on salary and commission equaling approximately $28,000 a year. He resigned to take employment with Phoenix at an annual salary of $34,000, and thereafter received several salary increases until he reached an annual salary of $64,800. Throughout his employment with Phoenix, Fincke repeatedly demanded that Christy increase the compensation he was receiving, based on his interpretation of his written contract.

Basically, Phoenix compensated its group insurance salesmen with a monthly advance accounted for through a "formula system". It was Christy's responsibility to operate this system. In January of 1974, Phoenix established a "freeze" on any increases in the compensation of group insurance personnel earning in excess of $40,000 per year.

In March of 1975, allegations were made to Mr. Campbell of the home office by Conrad Rawa, a Phoenix group sales agent in Erie, Pennsylvania, that Fincke had been involved in a serious conflict of interest in his operation of Region Six by avoiding proper application of the freeze. Campbell and Christy began an investigation into these allegations of payments to an All Eastern Insurance Agency, Inc. (All Eastern). Apparently, Fincke learned in the summer of 1974 that Paul Hughes, a Phoenix group salesman, had as a "silent partner" Conrad Rawa, a Phoenix sales agent, and with this knowledge, Fincke helped obtain a brokers license for All Eastern in September, 1974. This enabled Hughes to share in cash commissions paid to All East-

ern by Phoenix for group insurance cases contrary to Phoenix's policy, since group salesmen, unlike agents, were not entitled to cash commissions. Fincke tried to settle a dispute which later developed between Hughes and Rawa but failed, and the partnership was dissolved. A problem then developed over who would receive the cases upon dissolution. (Hughes did not want them because the "freeze" on group salesmen's salaries was still in effect.) The matter was resolved with the assignment of the cases to Nelson Harrison, a member of All Eastern, who, in turn, assigned them to All Eastern. The Harrison and All Eastern assignments were prepared by the Region Six Office Manager at Fincke's direction, and Fincke caused the executed assignments to be forwarded to the Phoenix home office. All of this was done to increase Hughes' commissions through the coverup of Hughes' ownership of All Eastern. Phoenix paid a total of $2,376.30 to All Eastern, but stopped any further payments when notified of this scheme in March of 1975.

When Rawa spoke to Campbell about Hughes' interest in All Eastern, he also made allegations to the effect that Hughes and All Eastern had been making cash payments to employees of Blue Cross of Western Pennsylvania. Fincke first learned of this situation from Hughes in the summer of 1974 but did not tell anyone at the home office about the situation until the March, 1975 investigation. One Blue Cross employee admitted during the investigation that he had received approximately $1,000 in finder's fees from Hughes or Rawa during the period 1970 through 1973, for referring prospective group insurance customers to them. Jerry Gindele, a Phoenix group sales person, admitted that he paid $900 during 1974 to two Blue Cross employees as finder's fees, and that he had been instructed by Fincke to lie to Campbell and Christy during their March, 1975 investigation.

Phoenix's law department reviewed all of the information received during the investigation and decided not to report any of these allegations to the Pennsylvania Insur-

**190**

ance Commission. On September 25, 1976, Fincke was requested to come to the home office in Hartford, Connecticut, and his employment was then terminated in writing.

## II.

■ The question before us is whether an employer can be held liable for intentionally interfering with contractual arrangements previously held by its employees. In this diversity action, we apply the law of Pennsylvania, which has adopted Section 766 of the Restatement of Torts on Intentional Interference with Contractual Relationships as recently summarized in *Behrend v. Bell Telephone Co.,* 242 Pa.Super. 47, 363 A.2d 1152, 1159 (1976), *vacated on other grounds* Pa., 374 A.2d 536 (1977), as follows:

"Pennsylvania has adopted the Restatement definition which formulates the tort in this way: 'one who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another, or (b) enter into or continue a business relation with another is liable to the other for harm caused thereby.' The courts have refined this definition to consist of three elements, stating that 'the actor must act (1) for the purpose of causing this specific type of harm to the plaintiff, (2) such act must be unprivileged, and (3) the harm must actually result.' *Birl v. Philadelphia Electric Co.,* 402 Pa. 297, 301, 167 A.2d 472, 474 (1960)."

It is obvious that Phoenix is not alleged to have induced Mutual to end its employment of Fincke, but that it persuaded Fincke to resign from Mutual to take up employment with Phoenix. Since Fincke terminated his employment with Mutual, Fincke has no cause to assert a tort of interference with contractual relationships against Phoenix.[1]

■ Nor does Pennsylvania law permit a terminated employee to assert against his supervisor a claim for intentional interference with his employment contract. In *Menefee v. CBS, Inc.,* 458 Pa. 46, 56, 329 A.2d 216, 221 (1974), a terminated radio personality sued his employer and his supervisors for conspiring to secure his termination in order to maliciously and unlawfully injure him. The Court in that case stated:

"As for that portion of appellant's 1970 complaint alleging a conspiracy to interfere with Robert Menefee's contractual relationship, the trial court was correct in its decision to dismiss that cause of action insofar as it named CBS, Inc., Downey and Grant as defendants. CBS, Inc., the other party to the contract, had the right to terminate the contract on thirteen weeks' notice. Downey and Grant, as employees of the radio station with a privilege to advise the station on handling its employees, were privileged to cause the station to terminate the contract. See § 722 of the Restatement of Torts."

*See also Roseman v. Hassler,* 382 F.Supp. 1328, 1341 (W.D.Pa.1974), *aff'd sub nom. Roseman v. Indiana University,* 520 F.2d 1364 (3rd Cir. 1975), *cert. den.* 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329.

1. In light of our disposition, we do not reach the Defendants' contention that they were privileged to induce Fincke to terminate his employment with Mutual in order to become employed by Phoenix. *Gresh v. Potter McCune Co.,* 235 Pa.Super. 537, 344 A.2d 540, *allocatur refused,* (1975); *Geib v. Alan Wood Steel Co.,* 419 F.Supp. 1205 (E.D.Pa.1976). In particular see *Perfect Subscription Co. v. Kavaler,* 427 F.Supp. 1289, 1294 (E.D.Pa.1977), where the following appears:

"Inducing an employee to terminate an employment at will is not illegal provided the only purpose is to secure the services of that employee. *Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy,* 415 Pa. 276, 203 A.2d 469,

471 (1964); *see also, Republic Systems and Programming, Inc. v. Computer Assistance, Inc.,* 440 F.2d 996, 1000–01 (2d Cir. 1971); *Motorola, Inc. v. Fairchild Camera and Instrument Corp.,* 366 F.Supp. 1173, 1180–81 (D.Ariz.1973). However, soliciting employees to terminate their employment at will can become illegal where the purpose is to injure the former employer, or obtain the trade secrets of the former employer. *Morgan's Home Equipment Corp. v. Martucci,* 390 Pa. 618, 136 A.2d 838, 847 (1957); *see also United Aircraft Corporation v. Boreen,* 284 F.Supp. 428, 443 (E.D.Pa.1968), *aff'd* 413 F.2d 694 (3d Cir. 1969)."

Thus, the second count of the complaint claiming damages from "Christy, as the individual who induced plaintiff to leave his prior lucrative employment and who then unlawfully and intentionally interfered with the plaintiff's employment with Phoenix", and that portion of the complaint claiming damages against "Phoenix, as the employer of Christy, . . . for the unauthorized acts of Christy performed in the scope of his employment with Phoenix . . for the wrongful termination of the business relationship between Phoenix and plaintiff by reason of the doctrine of respondent superior" must be dismissed. We note for the guidance of counsel that this does not remove from this action the question of Phoenix's liability in Count 1 for the value of the plaintiff's employment contract with Phoenix, which must be determined by the trier of facts in this case.

### III.

■ In the first count, Fincke has demanded punitive damages for breach of his employment contract. In *Carpel v. Saget Studios, Inc.*, 326 F.Supp. 1331 (E.D.Pa. 1971), the Court stated:

"Plaintiffs' claim for punitive damages in this contract action also must be rejected. Section 342 of the Restatement of Contracts is clear in its position that '[p]unitive damages are not recoverable for breach of contract.' Cited in *Local 127, United Shoe Workers of America, AFL–CIO v. Brooks Shoe Mfg. Co.*, 298 F.2d 277, 282, 282 n. 2 (3rd Cir. 1962); *see Pitts. C. & St. L. Ry. Co. v. Lyon*, 123 Pa. 140, 150, 16 A. 607 (1889)."

The Plaintiff here has practically abandoned the argument for punitive damages and, in light of recent opinions which were well catalogued in *Wood v. Hahnemann Medical College*, 1 Pa. D & C 3d 674 (CP. Phila. 1976), which sustained a demurrer against punitive damages claimed for breach of contract of employment, his action is understandable. Thus, summary judgment must be entered for the Defendants on the claim for punitive damages.

### IV.

■ Phoenix has filed a cross-claim for indemnity for any liability which it might have to All Eastern in a suit now pending in the Common Pleas Court of Allegheny County. Phoenix contends that in affidavits and depositions, Fincke conceded (1) that he knew when he acted on the Hughes matter that he was violating company policy and (2) that when he aided the Hughes-All Eastern connection, Hughes was able to receive additional compensation in violation of Phoenix's freeze, which establishes an intentional breach of fiduciary duties. To the contrary, Fincke contends he has established that his actions were a result of his judgment that (1) home office personnel either knew or were involved in the entire Blue Cross situation, (2) unless settlement was carried out there was possibility of public exposure, and (3) Phoenix would benefit with the temporary arrangement under the All Eastern assignment.

We note, as set forth in *National Aviation Underwriters, Inc. v. Altus Flying Service, Inc.*, 555 F.2d 778, 784 (10th Cir. 1977), that:

"The court must view the summary judgment papers in the light most favorable to the party opposing the motion. *Webb v. Allstate Life Insurance Co.*, *supra*, 536 F.2d [336] at 339–40. We must consider factual inferences tending to show triable issues in the light most favorable to the existence of such issues and summary judgment must be denied unless the movant demonstrates his entitlement to it beyond a reasonable doubt. *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33, 36 (10th Cir.). Affidavits are not a substitute for trial and summary judgment is improper where an issue turns on credibility as it did here. *Eagle v. Louisiana Southern Life Ins. Co.*, 464 F.2d 607, 608 (10th Cir.); *Riggs v. British Commonwealth Corp.*, 459 F.2d 449, 451 (10th Cir.). And it is particularly wrong to base a summary judgment on the deposition of an interested party on facts, like much of the pilot's experience, known only to him—a

situation where demeanor evidence might serve as real evidence to persuade a trier of fact to reject his testimony. *See Subin v. Goldsmith*, 224 F.2d 753, 758–59 (2d Cir.), *cert. denied*, 350 U.S. 883, 76 S.Ct. 136, 100 L.Ed. 779."

As shown above, there are genuine issues of material fact here which must be reserved for the fact finder and the Motion for Summary Judgment on the Counterclaim of Phoenix must be denied.